# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### DELTA DIVISION

**UNITED STATES OF AMERICA,**
*ex rel,* **THOMAS F. JAMISON**                                    **PLAINTIFFS**

**V.**                                                    **CAUSE NO.: 2:08CV214-SA-DAS**

**MCKESSON CORPORATION, et al.**                                    **DEFENDANTS**

## MEMORANDUM OPINION

Defendants McKesson Corporation ("McKesson") and McKesson Medical-Surgical MediNet, Inc., ("MediNet") filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) [20]. Defendants GGNSC Holdings, Golden Gate Ancillary, LLC ("Golden Gate"), Beverly Enterprises, Inc. ("Beverly"), Ceres Strategies, Inc. ("Ceres"), and Ceres Strategies Medical Services, LLC ("CSMS"), also filed a Motion to Dismiss premised on Federal Rules of Civil Procedure 9(b) and 12(b)(6) [22].

After reviewing the motions, responses, rules, and authorities, the Court makes the following findings:

*Medicare Reimbursement Overview*

Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, which is commonly referred to as "Medicare." Medicare is comprised of two parts, Part A, which is not at issue in this case, and Part B. Part B is funded by the United States and by insurance premiums that are paid by enrolled Medicare beneficiaries. Part B provides federal government funds to help pay for, among other things, certain durable medical equipment ("DME") and supplies for Medicare beneficiaries. DME is "equipment furnished by a supplier or a home health agency that--(1) can withstand repeated use; (2) is primarily

and customarily used to serve a medical purpose; (3) generally is not useful to an individual in the absence of an illness or injury; and (4) is appropriate for use in the home." 42 C.F.R. § 414.202 (2003).

Entities must complete and submit an application to the National Supplier Clearinghouse ("NSC") in order to become a Medicare Part B DME supplier. If accepted, the supplier is issued a Medicare Part B DME supplier number which is used to submit claims to a regional carrier for reimbursement. DME suppliers are required to meet certain "supplier standards" under the applicable statutes. When paying claims submitted by DME suppliers, the Government compensates suppliers for both the cost of the medical equipment used for the benefit of the Medicare patients and for the substantial patient services provided by the DME suppliers. According to the Government's Complaint, the reimbursement rates paid to DME suppliers is significantly higher than the actual costs of the supplies provided to the Medicare beneficiaries due to the Government's express requirement in the supplier standards that DME suppliers expend the time, effort, and expertise necessary to meet the medical needs of Medicare beneficiaries.

According to the Government, one of the most profitable DME services provided to nursing home patients is enteral nutrition. Medicare reimburses DME suppliers several hundred dollars per month for each beneficiary to whom enteral nutrition services are provided. The Government contends that DME suppliers enjoy a profit margin of as much as sixty percent for enteral business. In addition to enteral nutrition, DME suppliers provide other services and supplies, referred to as "non-enterals" to residents of nursing homes.

Typically, nursing home patients are referred to independent DME suppliers, who provide DME services through their own employees and who bill Medicare directly under its own Medicare

supplier number for the services provided. All monies paid by Medicare to such a DME supplier is retained by the DME supplier. The nursing home that referred the Medicare beneficiary to the DME supplier is entitled to no portion of the payment because it is not a DME supplier and did not provide the DME service.

*Factual and Procedural Background*

This action originated as a *qui tam* action filed by Thomas F. Jamison on December 29, 2004. The Government elected to intervene and filed the Complaint against these Defendants on October 3, 2008.

MediNet, a subsidiary of McKesson, is a national DME supplier that participates in the Medicare Part B program. MediNet offers "contract billing" services for large nursing home chains. The Government contends that in reality, MediNet offers to manage, direct, and arrange for DME services in nursing homes. MediNet then submits claims for those services to Medicare under the Medicare supplier number of a "sham" DME company owned by a nursing home chain, rather than under MediNet's own supplier number. As a result of this arrangement, nursing home chains are allowed to keep a substantial percentage of the profits resulting from the DME services managed by MediNet, and MediNet and its parent, McKesson, receive valuable referrals of the nursing home chain's DME business.

Particular to this action, the Government contends that McKesson, through its subsidiary, MediNet, "promised to provide nursing home owner, Defendant GGNSC Holdings, LLC, f/k/a Beverly Enterprises, Inc. ("Beverly"), millions of dollars in profits from the resulting Medicare payments in exchange for the nursing home's agreement to refer to McKesson DME supply business." Further, the Government asserts that McKesson accomplished this goal by setting up and

managing a "sham" DME supplier, CSMS, which was affiliated with Beverly but actually managed by MediNet.

The Complaint is premised on two statutes: the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Anti-Kickback Statute. The Government contends that violations of the Anti-Kickback Statute, which prohibits offering or paying remuneration to induce the referral of medical business (goods or services) paid for by the government, gave rise in this instance to violations of the False Claims Act. The Complaint alleges that MediNet, and its parent McKesson, violated the Anti-Kickback Statute, 42 U.S.C. Section 1320a-7b(b), in two ways: (1) offering illegal remuneration from Medicare Part B for referrals and (2) offering illegal remuneration from discounts provided for referrals. Intertwined through the allegations in the Complaint is the Government's contention that MediNet and McKesson directed the incorporation of a DME supplier, CSMS, that did not comply with supplier standards and was not functionally equipped to provide DME supplier services. McKesson and MediNet set this corporation up as an entity of the Beverly nursing home chain enabling Beverly to "capture" Part B reimbursement profits to which it would not otherwise be entitled. Moreover, in conjunction with the set up of the fictitious DME supplier, MediNet and McKesson offered substantial discounts to Beverly to induce that nursing home chain into referring its patients to MediNet/McKesson for DME services and products in violation of the False Claims Act.

In 2003, MediNet offered to provide billing services to Beverly for $55 per patient per month if the claims it processed were for enteral supplies provided by MediNet's affiliated wholesaler, or $75 per patient per month if the claims were for items provided by another wholesaler. Beverly referred its non-enteral supply business in 2003. In the Spring of 2006, Beverly and MediNet entered

4

a new agreement. Beverly elected to purchase enteral DME supplies from MediNet's affiliated wholesaler. MediNet agreed to provide a contract billing rate of $55 per patient per month. MediNet also continued to supply non-enteral DME supplies to Beverly on a full assignment basis in 2006.

The Government further asserts that McKesson and MediNet caused the submission of false claims under Medicare Part B because they knew that CSMS was a "sham" Part B supplier that failed to meet supplier standards. In particular, the Government contends that the Defendants violated the False Claims Act by knowingly presenting, and causing to be presented, false claims for payment in violation of 31 U.S.C. § 3729(a)(1). In Count II, the Government alleges that the discounts offered by MediNet for business referrals by Beverly violated 31 U.S.C. § 3729(a)(1). Moreover, the Government asserts that the Defendants' use of a "sham" DME entity that did not comply with the standards necessary for payment by Medicare violated the False Claims Act. As to Count IV, the Government alleges that the Defendants' engagement in a conspiracy to submit false claims constituted a violation of 31 U.S.C.§ 3729(a)(3). The Government also contends that the Defendants used false records to get false claims paid in violation of 31 U.S.C. § 3729(a)(2). Additionally, the Government brings an unjust enrichment claim against all defendants that received money, either directly or indirectly, to which they were not entitled.

Defendants brought motions to dismiss based on Federal Rules of Civil Procedure 9(b) and 12(b)(6). Defendants ask that this Court strike certain pleadings that do not allege fraud particularly or which fail to state a claim. Alternatively, the Defendants seek dismissal of the entire complaint for those reasons.

*Rule 9(b) Fraud Pleading Standard*

Federal Rule of Civil Procedure 9(b) governs the pleading standard when a plaintiff alleges fraud in their complaint. Rule 9(b) serves several purposes, including "protecting a defendant's reputation from the harm that general, unsubstantiated fraud accusations will cause, and preventing a claimant from searching for a valid particular claim after filing suit." Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc., 104 Fed. Appx. 945, 950 (5th Cir. 2004). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "At a minimum, [this] requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." United States ex rel. Williams v. Bell Helicopter Textron Inc., 417 F.3d 450, 454 (5th Cir. 2005) (citing United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 (5th Cir. 1997)). In considering a motion to dismiss under Rule 9(b), courts must accept the complaint's allegations as true. See United States ex rel. James H. Grubbs, M.D. v. Kanneganti, 565 F.3d 180, 185 (5th Cir. 2009); Williams, 417 F.3d at 453.

The Defendants allege two overall reasons that this Complaint should be stricken or dismissed: (1) GGNSC, Golden Gate, Ceres, and McKesson all contend that the Complaint fails to comply with Rule 9(b) because no particular acts by these defendants are identified, and the mere existence of a corporate relationship does not create liability under the False Claims Act; and (2) as to all Defendants, the Government does not link the Defendants' conduct to any single false claim or conspiracy to submit a false claim.

The Government contends that Defendants Beverly, CSMS, McKesson, and MediNet are liable under the False Claims Act as they submitted, or caused to be submitted, false claims to Medicare for DME services. The Government alleges that GGNSC is liable for the actions taken

by Beverly because in its acquisition of the nursing home chain, GGNSC acquired all of its assets and liabilities. Furthermore, the Government asserts Golden Gate and Ceres are sued only for unjust enrichment due to their receipt of money to which they were not entitled as a parent corporation of CSMS.

As to McKesson's violation of the Anti-Kickback Statute, i.e., causing false claims to be submitted, the Government alleges that through the Medinet-CSMS scheme, Beverly was induced to buy DME enteral and non-enteral supplies and other products for their nursing homes from McKesson. Specifically, MediNet offered lower prices on its contract billing if Beverly committed to purchase its DME supplies from McKesson. The Government alleges that McKesson used MediNet, its subsidiary, as a conduit between Beverly and McKesson in order to sell its products to the nursing home chain. As a result of this arrangement, the Government contends the nursing home chain was allowed to retain a substantial percentage of money paid by Medicare for DME services, and McKesson was allowed to furnish exclusively DME supplies that are paid for, in whole or in part, by Medicare. As evidence of McKesson's involvement, the Government references several internal documents regarding the Medinet/Beverly arrangement. The Government excerpted a quote from a January 2002 McKesson "Strategic Planning" document showing that McKesson acknowledged discounting its claim fees in order to keep product sales. The excerpt does not particularly reference Beverly or any other defendant.

The Government also contends that McKesson organized CSMS as a "sham" DME supplier to induce Beverly to refer its patient base to MediNet and McKesson. McKesson allegedly prepared "P & L pro formas" in which they stated that Beverly could make "approximately $11.7 MM profit" by "capturing their Part B profit." This document also details McKesson's role in helping Beverly

attain that profit. The Government referenced a September 4, 2002, internal document in which McKesson executives acknowledged that McKesson would provide a "turn-key implementation" for the operation of CSMS. On September 10, 2002, another McKesson executive sent a letter to Beverly addressing the incentives McKesson would provide to Beverly in exchange for referrals of business from the nursing home chain. McKesson estimated that it would make a $500,000 annual profit from the resulting referrals by Beverly to MediNet of non-enteral DME business in 2003.

As to the supposed fraud perpetrated by McKesson, the Government has met its Rule 9(b) burden by alleging the requisite who, what, when, where, and how of the fraud as required by case law. As evidenced above, the Government has alleged sufficient details about Beverly's involvement, as well, to survive a Rule 9(b) motion. Because the Government has alleged that GGNSC assumed Beverly's liabilities, that corporation has been noticed regarding its potential involvement accordingly. No fraudulent conduct on the part of Golden Gate or Ceres was alleged in the Complaint as to false claims. Moreover, the Government acknowledges in its Response that it only asserts a claim for unjust enrichment against Golden Gate and Ceres. Therefore, all claims against Golden Gate and Ceres, except the Government's claim of unjust enrichment, are hereby dismissed.

Rule 9(b) also prevents nuisance suits and the filing of baseless claims as a pretext to gain access to a "fishing expedition." Grubbs, 565 F.3d at 191. Defendants contend that the Government's allegations and allusions to causes of action against unnamed entities violates Rule 9(b). Indeed, the Government responded to the motion to dismiss by stating that the "Government plans to investigate, through discovery in this case, the extent to which McKesson and MediNet are engaged in similar kickback schemes with other nursing home chains." The Government has not

satisfied the Rule 9(b) pleading standard as to those allegations against any unnamed defendant. Accordingly, paragraphs 86, 93, 101, and 114 of the Complaint are stricken.

The Fifth Circuit has recently articulated the level of detail needed to satisfy Rule 9(b) and the False Claims Act with respect to the false claim.  In <u>United States, ex rel. James H. Grubbs, M.D. v. Kanneganti</u>, 565 F.3d 180 (5th Cir. 2009), the Court "confront[ed] squarely with what particularity a complaint must plead the actual details of the false claim itself."

> The False Claims Act makes it a civil violation for any person who
>
> [(a)(1)] knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> [(a)(2)] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> [(a)(3)] conspires to commit a violation of [the False Claims Act].

31 U.S.C. § 3729.[1]

The Fifth Circuit noted that Section 3729(a)(1) includes an express presentment requirement.  The Court stated that "[f]raudulent presentment requires proof only of the claim's falsity, not of its exact contents."  Indeed, the Fifth Circuit held, "a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted." <u>Grubbs</u>, 565 F.3d at 189.  Moreover, "[t]o require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not

---

[1]The parties in this case and the case law of this statute refer to the cited subsections as (a)(1), (a)(2), and (a)(3) respectively even though in the statute they are lettered (A), (B) and (C). To avoid confusion, the Court will refer to the statute provisions cited above as (a)(1), (a)(2), and (a)(3).

demanded to win at trial and significantly more than any federal pleading rule contemplates." Id. at 189-90. Thus, "to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." Id. at 190.

As noted above, the Government has alleged sufficient detail of the scheme involving the creation of CSMS as a "sham" DME provider and the alleged kickbacks from MediNet to Beverly. The Government excerpted quotations from internal memoranda as well as referenced specific documents evidencing the perpetration of the alleged fraud. Thus, the Government has submitted reliable indicia as to the arrangement. Moreover, it is undisputed that MediNet filed over 56,000 claims, totaling over $23 million worth of reimbursements from Medicare. Thus, the Government sufficiently pled that false claims were presented to the Government for payment.

As to a False Claims Act violation of Section 3729(a)(2), the concept of presentment is not mentioned. Grubbs, 565 F.3d at 192-93; 31 U.S.C. § 3729(a)(2) (creating a civil violation for any person that "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"). Thus, "[f]or this section, the recording of a false record, when it is made with the requisite intent, is enough to satisfy the statute; we need not make the step of inferring that the record actually caused a claim to be presented to the Government." Id.

The Government alleges that the Defendants made or caused to be made false records, statements, and explicit and implicit certifications to get false claims paid. Throughout the forty-six page Complaint, the Government specifies three examples of the Defendants' submitting false

records. First, the Government asserts that CSMS, MediNet, and McKesson falsified, or caused the falsification of, their Medicare Part B supplier enrollment certifications which included the following statement: "I understand that payment of a claim by Medicare . . . is conditioned on the claim and the underlying transaction complying with such laws . . . (including, but not limited to, the Federal Anti-Kickback Statute) . . .." The Government contends that CSMS was required to attest to this provision each time it submitted and renewed its supplier application. Because the parties were engaged in an illegal remuneration for business referral scheme, the Government contends that at the time of signing these documents, the Defendants knew that they were violating the Anti-Kickback Statute.

Second, the Government states CSMS provided false statements to the NSC in December of 2007 in order to get their supplier number reinstated. In particular, the Government alleges that CSMS knowingly misled state licensing officials to issue state licenses to CSMS even though CSMS was not in compliance with those states' requirements. Thus, CSMS fraudulently induced the states to issue licenses, and in reliance on those false statements, the NSC reinstated CSMS's supplier number.

Third, the Government alleges that MediNet submitted claims to Medicare representing that CSMS was the provider of the DME services for which reimbursement was sought. The Government contends that MediNet was the actual service provider. Indeed, the Government further notes that both MediNet and CSMS knew that those representations were false.

Accordingly, under Section 3729(a)(2), the Government has sufficiently noticed Defendants of the underlying false statements; thus, this allegation complies with Rule 9(b).

The Government also alleges violations of the False Claims Act's conspiracy provision.

Section 3729(a)(3) subjects to civil liability any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." To prove a False Claims Act conspiracy, a relator must show "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement." United States ex rel. Farmer v. City of Houston, 523 F.3d 333, 343 (5th Cir. 2008). A plaintiff alleging a conspiracy to commit fraud must "plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy." Grubbs, 565 F.3d at 193. The Fifth Circuit held that "[a]s in § 3729(a)(2), the conspiracy provision lacks a presentment element, thus presentment of a false claim need not be proven nor pled to prevail on a False Claims Act conspiracy charge." Id.

In this action, the Government alleges that the Defendants conspired together to defraud the Government in order to get false or fraudulent claims paid by Medicare. As evidence of such agreement, the Government cites the contract entered into between McKesson, MediNet, CSMS, and Beverly. Pursuant to that contract, McKesson and MediNet offered and promised to deliver to (and capture for,) Beverly and CSMS millions of dollars in annual profits from Medicare payments for enteral services, in exchange for the referral by Beverly and CSMS to MediNet of both all enteral orders from all Medicare residents of all Beverly nursing homes and all orders for non-enteral DME services for all Medicare residents of all Beverly nursing homes. The Government contends under this agreement, MediNet was to provide for the furnishing of all enteral services, but it would allow CSMS to retain the profits realized from Medicare Part B reimbursement. However, MediNet would keep for itself all profits from the Medicare billings for all non-enteral DME services. The Government alleged the joint actions taken in furtherance of the conspiracy as (i) the creation of

CSMS as a DME supplier; (ii) referrals of DME and other business from Beverly and CSMS to McKesson and MediNet; (iii) referrals of DME and other business to MediNet and McKesson in exchange for discounts; (iv) provision of Medicare Part B payments to CSMS for enteral services in exchange for MediNet and McKesson's actual performance of the services; and (v) submission of claims to Medicare in the name of CSMS despite the fact that the services for which payment was sought had not been provided by CSMS. Accordingly, the Government has sufficiently pled a conspiracy claim under the False Claims Act with particularity.

Defendants' motions to dismiss pursuant to Rule 9(b) are granted in part and denied in part. All allegations concerning unnamed nursing home entities are struck. The Government has sufficiently pled False Claims Act allegations under 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3) against GGNSC, Beverly, CSMS, McKesson, and MediNet.

*Motion to Dismiss under Rule 12(b)(6)*

In considering a motion under Rule 12(b)(6), the "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." In Re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007). To overcome a Rule 12(b)(6) motion, Plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); accord Ashcroft v. Iqbal, — U.S. —, 129 S. Ct. 1937, 173 L. Ed. 2d 868, 883-85 (May 18, 2009). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555, 127 S. Ct. 1955 (quotation marks, citations, and footnote omitted).

1. <u>False Claims Act, 31 U.S.C. § 3729(a)(1)</u>

To state a claim under the False Claims Act, specifically 31 U.S.C. § 3729(a)(1), the relator must demonstrate that: (1) the defendants presented to the government a claim for payment; (2) the claim was false or fraudulent; (3) the defendants knew that the claim was false; and (4) the government suffered damages as a result of the false or fraudulent claim. <u>United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.</u>, 20 F. Supp. 2d 1017, 1019 n.1 (S.D.Tex. 1998) (citing <u>Young-Montenay, Inc. v. United States</u>, 15 F.3d 1040, 1043 (Fed. Cir. 1994)).

*a. Presentation of a claim for payment*

As to the first prong, in 2003, MediNet supplied to Beverly, through CSMS, all non-enteral supplies. Beginning in 2006, MediNet supplied to Beverly, through CSMS, all enteral DME supplies and all non-enteral DME supplies. Over 56,000 claims were submitted for a total Medicare Part B reimbursement of $23 million. Accordingly, taking the facts in the Complaint as true, McKesson, MediNet, CSMS, and Beverly presented to the government a claim for payment.

*b. Claim was false or fraudulent*

The second prong, whether the claim was false or fraudulent, requires the Court to analyze two theories propounded by the Government. First, the Government contends that the claims submitted by the Defendants were false or fraudulent due to the illegal scheme involving the creation of CSMS as a DME supplier. Second, the Government asserts that the claims submitted were false or fraudulent because of an express or implied false certification by CSMS and MediNet.

The Medicare anti-kickback statute prohibits (1) the solicitation or receipt of remuneration in return for referrals of Medicare patients, and (2) the offer or payment of remuneration to induce such referrals. 42 U.S.C. § 1320a-7b(b). In particular, the Anti-Kickback Statute imposes liability

on anyone who

> knowingly and willfully offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b) (2008).

The Government alleges that Defendants violated the Anti-Kickback Statute in two ways: (1) remuneration to Beverly and CSMS in the form of Medicare profits for DME supply work performed by MediNet in return for referrals of business from Beverly to McKesson; and (2) remuneration to Beverly and CSMS in the form of discounts on MediNet's services in return for referrals of business from Beverly to McKesson. As to the first allegation, the "reimbursement for referrals," the Government explains that CSMS was set up, not to deliver DME items to Medicare-eligible patients at Beverly's nursing homes, but to deliver referrals to MediNet, who completes and files all paperwork for all DME orders for the Medicare patients in Beverly's nursing homes. Beverly was able to deliver to MediNet and McKesson a substantial number of product referrals through its nursing home residents. In return, MediNet and McKesson delivered to Beverly the Medicare Part B profit realized on the enteral DME claims, which as noted above, could be up to sixty percent of the actual cost of the enteral supplies. MediNet, therefore, filled out the DME enteral supply paperwork in the name of CSMS in order to provide Beverly with an estimated $6.2 million annual profit from those supplies. Under this arrangement, MediNet would submit all non-enteral supply claims and retain the profits from those sales to Beverly's nursing home patients.

The second "scheme" that the Government contends the Defendants engaged in involves discounts offered to and accepted by Beverly for MediNet's DME enteral services. MediNet and

McKesson originally offered those enteral services management fee to Beverly for $70 per patient per month. The Government asserts that in an effort to induce Beverly to refer all patients and its enteral products needs to MediNet and McKesson, those entities agreed to provide those services for a discounted $55 per patient per month fee. The Government contends that this discount represents illegal remuneration under the Anti-Kickback statute.

Defendants contend that the Government has failed to state a violation of the Anti-Kickback Statute and False Claims Act under its "reimbursement for referral" allegations. In particular, they allege that no court has previously examined this issue, therefore, there is no legal precedent making this claim a violation of the statutes. Defendants also point out that Medicare reimburses suppliers; therefore, there was no exchange of remuneration between the parties.

Inducement serves a central role in assessing claims of Medicare fraud. See Polk County, Tex. v. Peters, 800 F. Supp. 1451, 1455 (E.D. Tex. 1992) ("The gravamen of Medicare fraud is inducement."). "Giving a person an opportunity to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient." Id. Courts strictly enforce the inducement prohibitions codified in the Anti-Kickback Statute. See United States v. Bay State Ambulance and Hosp. Rental Serv., Inc., 874 F.2d 20, 30 (1st Cir. 1989). In view of this aggressive reading of the statute, "the issue of sole versus primary reason for payments is irrelevant since any amount of inducement is illegal." Id.; accord United States v. Greber, 760 F.2d 68, 72 (3d Cir. 1985) (finding that payment to physicians violated Anti-Kickback Statute if, in addition to compensating the physicians for legitimate duties, it was also intended to induce referrals).

Thus, Defendants have sufficiently alleged that Beverly may have been improperly induced to engage in a contract with MediNet and McKesson due to MediNet and McKesson's assurance that

CSMS would realize profits for enteral DME supplies without having to perform the service associated with those supplies.

As to the discount allegations, the Defendants assert that the Government's failure to contend that the "discounted rate" was below fair market value renders the claim untenable. The Government contends that under the statute, any inducement for referrals is illegal, therefore, fair market value is not in issue.

"Legion courts have held that compliance with [Anti-Kickback Statute] requires that a provider pay fair market value to a physician for his services." <u>United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.</u>, 565 F. Supp. 2d 153, 162 (D.D.C. 2008) (citing <u>United States v. Rogan</u>, 459 F. Supp. 2d 692, 722-23 (N.D. Ill), *aff'd* 517 F.3d 449 (7th Cir. 2008) (emphasizing physicians' receipt of payment was far in excess of market value for contractual duties performed in finding violation of Anti-Kickback Statute); <u>United States ex rel. Obert-Hong v. Advocate Health Care</u>, 211 F. Supp. 2d 1045, 1049 (N.D. Ill. 2002) (noting that while the Anti-Kickback Statute does not prohibit hospitals from acquiring medical practices, or preclude the seller-doctor from making future referrals to the buyer-hospital, there must be no economic inducements for those referrals. Further, to comply with the statute, "the hospital must simply pay fair market value for the practice's assets.")). Indeed, "[p]ayment exceeding fair market value is in effect deemed payment for referrals." <u>Am. Lithotripsy Soc'y v. Thompson</u>, 215 F. Supp. 2d 23, 27 (D.D.C. 2002). The Anti-Kickback Statute itself states that impermissible remuneration includes "transfers of items or services for free or other than fair market value." 42 U.S.C. § 1320a-7a(i)(6).

However, some courts have acknowledged that the Anti-Kickback Statute's use of the term "any remuneration" suggests that the statute should be read expansively to include any transfer of

benefit as remuneration under the statute. See United States v. The Health Alliance of Greater Cincinnati, 2008 WL 5282139, *7-8 (S.D. Ohio Dec. 18, 2008); United States v. Shaw, 106 F. Supp. 2d 103, 114 (D. Mass. 2000) ( "Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever . . . Moreover . . . Congress prohibited transactions where there is no direct payment at all from the party receiving referrals").

Regardless of which line of reasoning this Court finds persuasive, the Government has met its burden under Rule 12(b)(6). In particular, as to the fair market value, the Government has asserted, and the Defendants have not refuted, that MediNet and McKesson offered to Beverly a discounted price for its enteral supplies business. McKesson acknowledges in its response that in 2003, Beverly purchased its enteral supplies from a supplier known as Gulf South for $70 per patient per month. In 2006, Beverly purchased its enteral supplies from MediNet/McKesson for $55 per patient per month. Thus, with the facts in the record as they are today, the Government has sufficiently pled a claim under the Anti-Kickback Statute; thus, the Government has shown that the claims submitted by MediNet and CSMS may have been false. See United States v. Shaw, 106 F. Supp. 2d 122 (D. Mass. 2006) (noting that the burden of establishing fair market value was on the defendants and was a proper inquiry at the summary judgment stage).

The Government also argues that the Defendants caused false or fraudulent claims to be submitted by falsely certifying compliance with certain statutes and regulations. The False Claims Act recognizes two types of actionable claims--factually false claims and legally false claims. In a run-of-the-mill "factually false" case, proving falsehood is relatively straightforward: A relator must generally show that the government payee has submitted "an incorrect description of goods or

services provided or a request for reimbursement for goods or services never provided." <u>Mikes v. Straus</u>, 274 F.3d 687, 697 (2d Cir. 2001). By contrast, in a claim based on an alleged legal falsehood, the relator must demonstrate that the defendant has "certifie[d] compliance with a statute or regulation as a condition to government payment," yet knowingly failed to comply with such statute or regulation. <u>Id</u>.; <u>see also</u> <u>Shaw v. AAA Eng'g & Drafting, Inc.</u>, 213 F.3d 519, 531 (10th Cir. 2000). Here, the Government's claims fall in the latter category.

Legally false certification claims can rest one of two theories--express false certification, and implied false certification. <u>Id</u>. An express false certification theory applies when a government payee "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." <u>Mikes</u>, 274 F.3d at 698. This promise may be any false statement that relates to a claim, whether made through certifications on invoices or any other express means. <u>See</u> <u>United States ex rel. Hendow v. Univ. of Phoenix</u>, 461 F.3d 1166, 1172 (9th Cir. 2006) ("So long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach.").

Under an implied false certification theory, by contrast, courts do not look to the supplier's actual statements; rather, the analysis focuses on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment. <u>See</u> <u>United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.</u>, 543 F.3d 1211, 1217-1218 (10th Cir. 2008); <u>United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.</u>, 214 F.3d 1372, 1376 (D.C. Cir. 2000); <u>see also</u> <u>Shaw</u>, 213 F.3d at 531-33. If a supplier knowingly violates such a condition while attempting to collect remuneration from the government, he may have submitted an impliedly false claim. <u>See</u> <u>Shaw</u>, 213 F.3d at 531-32.

The Fifth Circuit has held that "where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997). Under this approach, when an underlying regulation expressly prohibits payment upon non-compliance with its terms, the submission of a claim implicitly certifies compliance with that regulation. See United States ex rel. Quinn v. Omnicare Inc., 382 F.3d 432, 442 (3d Cir. 2004).

Submitting false certificates of compliance with federal health care law, such as the Anti-Kickback Statute, creates False Claims Act liability. See Thompson, 125 F.3d at 902. "Where the government pays funds to a party and would not have paid those funds had it known of a violation of a law or regulation, the claim submitted for those funds contained an implied certification of compliance with the law or regulation and was fraudulent." Pogue., 238 F. Supp. 2d at 264. The Medicare program requires providers to affirmatively certify that they have complied with the Anti-Kickback Statute; therefore, failure to comply with the kickback laws is, in and of itself, a false statement to the government. See id.(discussing kickback certifications under Medicare and holding that failure to comply with the kickback laws implicates the False Claims Act).

Here, the Government has submitted that CSMS, McKesson, and MediNet filed with, or caused to be filed with, Medicare a certification statement on February 23, 2003. It further alleges that CSMS knew when it made such certification that it intended to conduct the kickback schemes in conjunction with McKesson, MediNet, and Beverly. Thus, at the time of signing those certifications, CSMS knew it would not comply with the Anti-Kickback Statute. Further, to remain eligible to submit Medicare claims, and as a legally necessary condition of its entitlement to be paid

on each and every such claim, CSMS in 2006 used, made and communicated, and McKesson and MediNet caused to be used, made and communicated, a further certification statement upon the three-year enrollment of CSMS as a Medicare DME supplier. According to the Government, each presentation of claims by CSMS for reimbursement by Medicare contained and used an implied certification that the same certification statement remained true, and that the claim was not the result of any violation of the Anti-Kickback Statute.

The Government also cites the language from those enrollment certifications which include the following express representation: "I am familiar with and agree to abide by the Medicare or other federal health care program laws, regulations and program instructions that apply to my provider/supplier type . . . I understand that payment of a claim by Medicare . . . is conditioned on the claim and the underlying transaction complying with such laws . . . (including, but not limited to, the Federal Anti-Kickback Statute . . .)." Thus, the Government contends, any legal entitlement to any payment by the Medicare regional coordinators in response to any claims by MediNet or CSMS during the resulting period of enrollment was expressly conditioned on the underlying transactions complying with the Anti-Kickback Statute. For purposes of this 12(b)(6) inquiry, the Government has sufficiently pled that CSMS, MediNet, and McKesson's representations on certifications and submissions of claims may have been made as a condition of payment under Medicare Part B. Thus, the allegations could form the basis of a false claim under the False Claims Act.

The Defendants contend further that the Government failed to allege that the Defendants had knowledge as required by the False Claims Act. The False Claims Act defines the terms "knowing" and "knowingly" as a person that "has actual knowledge of the information; acts in deliberate

ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity

of the information." 31 U.S.C. § 3729(b)(1)(A)(i-iii). Moreover, knowledge under the False Claims

Act "require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B). A review of the

Complaint evidences that the Government has sufficiently pled under Rule 8(a) that MediNet,

McKesson, Beverly, and CSMS had knowledge of the falsity of the claims due to the underlying

alleged kickbacks and the parties alleged involvement as discussed above.

Defendants contend that the Government has failed to allege a nexus between the claims

submitted for enteral supplies in 2003 and any alleged kickback. The Defendants contend that only

non-enteral business was referred to MediNet in 2003. However, the Defendants acknowledge that

the Government has sufficiently pled a nexus among the other transactions, including the 2003 non-

enteral referrals and the 2006 enteral and non-enteral claims.

The Government asserts that the required nexus for the 2003 enteral contract exists because

the non-enteral supply contract in 2003 taints the entire contract between MediNet/McKesson and

Beverly. As noted by Defendants, even if McKesson and Medinet offered discounts, Beverly was

not induced to refer their patients at that time. The Anti-Kickback Statute prohibits the offer of

remuneration to induce referrals. Accordingly, McKesson and MediNet's offer of a discount for any

supposed referral violates the statute. Thus, the Government has put forth sufficient facts to allege

the appropriate nexus between the alleged fraudulent acts and Beverly/CSMS' claims for enteral

supplies between 2003 and 2006 under their contract with Gulf South.

Thus, as to Counts I, II, and III, the Government has sufficiently alleged claims under 31

U.S.C. § 3729(a)(1) as to MediNet, McKesson, Beverly, and CSMS for violations of the Anti-

Kickback Statute. The Government has failed to plead that Beverly submitted any false certification

in this case. Accordingly, the Government's claims against Beverly under 31 U.S.C. § 3729(a)(1) as to false certifications as a basis for false claims are dismissed.

    2.  <u>False Claims Act, 31 U.S.C. § 3729(a)(2)</u>

The Defendants contend that the Complaint does not allege that MediNet submitted or caused to be submitted any false statement in order to get a claim paid. Moreover, CSMS asserts that the certification statement it signed promising to comply with all statutes and regulations was a future promise that can not be the basis of a claim under the False Claims Act. Count V alleges that all Defendants made, used, and caused to be made and used, false records, statements, and explicit and implicit certifications to get false claims paid in violation of 31 U.S.C. § 3729(a)(2). The False Claims Act imposes liability not only on any person who submits a false or fraudulent claim for payment, but also on any person who knowingly makes a false statement in order to get a false or fraudulent claim paid. 31 U.S.C. § 3729(a)(2).

As noted above, the Government has sufficiently alleged that CSMS, Medinet, and McKesson have submitted false certification to the Government in order to be reimbursed under Medicare Part B. Accordingly, it has satisfied the requirements for a 31 U.S.C. § 3729(a)(2) claim as to those Defendants as well.

    3.  <u>False Claims Act, 31 U.S.C. § 3729(a)(3)</u>

Under Section 3729(a)(3) of the False Claims Act, the conspiracy provision, the United States must prove by a preponderance of the evidence: (1) An agreement, combination, or conspiracy to defraud the Government by getting a false or fraudulent claim allowed or paid; and (2) the defendant did so for the purpose of obtaining or aiding to obtain payment from the Government or approval of a claim against the Government. 31 U.S.C. § 3729; <u>United States ex rel. Marcus v. Hess,</u>

317 U.S. 537, 544-45, 63 S. Ct. 379, 87 L. Ed. 443 (1943). GGNSC, Golden Horizons, and Ceres contend that they should be dismissed on this Count as they cannot conspire with each other to violate the False Claims Act. As noted above, in the Government's response, it asserted that Ceres and Golden Horizons were only liable under the "unjust enrichment" cause of action; therefore, those Defendants are not alleged to have conspired to defraud the Government. Thus, all that is left is GGNSC's contention that under the intra-corporate conspiracy doctrine, Beverly could not conspire with CSMS, which necessitates their dismissal from that cause of action. The Government responded that each Beverly unit is alleged to have conspired not only with one another, but also with each McKesson entity and subsidiary. Therefore, according to the Government, Beverly, CSMS, McKesson, and MediNet are necessary parties to the conspiracy.

"[G]eneral civil conspiracy principles apply" to False Claims Act conspiracy claims under 31 U.S.C. § 3729(a)(3). United States ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 545 n.3 (7th Cir. 1999). The essence of a civil conspiracy is as follows:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

United States v. Murphy, 937 F.2d 1032, 1039 (6th Cir. 1991).

A parent corporation and its wholly owned subsidiaries, however, are legally incapable of forming a conspiracy with one another. United States ex rel. Brooks v. Lockheed Martin Corp., 423 F. Supp. 2d 522, 528 (D. Md. 2006) (citing Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 770-71, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984) ("In any conspiracy, two or more entities that

previously pursued their own interests separately are combining to act as one for their common benefit . . ." but, "a parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.").

After extensively reviewing the Complaint in this matter, this Court finds that the Government has sufficiently alleged that each individual entity conspired with others in furtherance of the supposed scheme outlined above. In particular, the Government alludes to documents between McKesson and Beverly regarding the CSMS arrangement, proposals sent to CSMS from MediNet, as well as other actions between the parties from which a reasonable trier of fact could infer an agreement. However, as to the Government's claims that Beverly or McKesson could conspire with its wholly owned subsidiaries, the Government has failed to state a claim upon which relief can be granted. Accordingly, the Government's conspiracy claims survive this examination under 12(b)(6) but only to the extent that the conspiracy alleged does not involve agreements and overt acts taken solely between the corporations and their wholly owned subsidiaries.

*Conclusion*

The Government has sufficiently asserted the particular allegations necessary in order to comply with Federal Rule of Civil Procedure 9(b). At this stage in the proceedings, and taking all factual inferences put forth by the Plaintiff as true, the Government has also sustained its burden under Rule 12(b)(6). Accordingly, the Defendants' Motions to Dismiss [20, 22] are hereby GRANTED IN PART and DENIED IN PART.

SO ORDERED, this the  29th   day of September, 2009.

 **/s/ Sharion Aycock**          
**U.S. DISTRICT JUDGE**