# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### DELTA DIVISION

**UNITED STATES OF AMERICA,**
*ex rel,* **THOMAS F. JAMISON**                  **PLAINTIFFS**

**V.**                  **CAUSE NO.: 2:08CV214-SA-DAS**

**MCKESSON CORPORATION, et al.**                  **DEFENDANTS**

## <u>MEMORANDUM OPINION</u>

Defendants have filed motions to dismiss the Relator, Thomas Jamison, from this action [62, 65]. The Relator has also filed a Motion for Partial Summary Judgment [64] on the same grounds. After reviewing the motions, responses, exhibits, and authorities, the Court makes the following findings:

*The Relator's Complaint*

The Relator, Thomas Jamison, filed his original complaint in 2004 against over four hundred defendants. Civil Action No.: 2:04cv355-Sealed. The complaint was amended on June 22, 2006. Portions of that complaint have been unsealed and constitute this new lawsuit based on the Government's intervention. The Defendants named in the new unsealed action include: (1) McKesson Corporation, a medical wholesale company; (2) McKesson Medical-Surgical MediNet, Inc. ("MediNet"), a DME supplier and claim-submission service provider; (3) GGNSC Holdings, LLC, successor to Beverly; (4) Golden Gate Ancillary, owner of Ceres Strategies, Inc.; (5) Beverly Enterprises, a skilled nursing facility chain acquired by GGNSC; (6) Ceres Strategies, Inc., a supplier of medical products; and (7) Ceres Strategies Medical Services ("CSMS"), a DME supplier with no customers other than residents of Beverly nursing homes. Relator's Amended Complaint alleges that Beverly, McKesson, and Medinet formed an improper joint venture by setting up a "sham" durable

medical equipment (DME)[1] supplier under the control of Beverly. According to the Amended

Complaint, the shell DME supplier, CSMS, was created solely to provide DME supplies and service

to Beverly's captive patient base. Relator alleges that CSMS, as well as the other Defendants,

violated the False Claims Act by failing to conform to the 21 Supplier Standards[2] promulgated for

the regulation of DME suppliers.[3]

*Applicable Standard*

Defendants allege that because the Complaint is based on publicly disclosed allegations and

transactions, and the Relator is not the original source of the information, this Court lacks subject

matter jurisdiction over the claims of Thomas Jamison. Because federal courts are courts of limited

jurisdiction, jurisdictional statutes must be "strictly construed," and doubts resolved against federal

jurisdiction." Boelens v. Redman Homes, Inc., 748 F.2d 1058, 1067 (5th Cir. 1984).

The Defendants in this action filed their motions as 12(b)(1) motions to dismiss for lack of

subject matter jurisdiction. However, the Fifth Circuit has noted that a challenge under the FCA's

public disclosure bar should be treated as a motion for summary judgment, as it is necessarily

intertwined with the merits of the case. United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l

Healthcare Sys., 384 F.3d 168, 173 (5th Cir. 2004); United States ex rel. Laird v. Lockheed Martin

Eng'g and Sci. Serv. Co., 336 F.3d 346, 350 (5th Cir. 2003). Thus, summary judgment is proper if,

---

[1]The term "DME" or "durable medical equipment" as used throughout this Memorandum
Opinion refers to the durable medical equipment, prosthetics, orthotics, and supplies industry
(sometimes referred to as "DMEPOS").

[2]Those 21 Supplier Standards can be found at 42 C.F.R. Section 424.57(c).

[3]Relator also brought a claim for cost reporting fraud, but the Government did not
intervene as to that theory of recovery.

viewing the evidence and inferences drawn from the evidence in a light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); Reagan, 384 F.3d at 173.

*Statutory Background and Analysis*

The False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3732, permits "suits by private parties on behalf of the United States against anyone submitting a false claim to the government[.]" Laird, 336 F.3d at 351. Private parties who initiate these "qui tam" actions are known as "relators"and serve as a "posse of *ad hoc* deputies to uncover and prosecute frauds against the government." United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 184 (5th Cir. 2009) (quoting United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr., 961 F.2d 46, 49 (4th Cir. 1992)). By allowing *qui tam* actions, the Act "encourage[s] whistleblowers with genuinely valuable information to act as private attorneys general in bringing suits for the common good," while "discourag[ing] opportunistic plaintiffs from filing parasitic lawsuits that merely feed off previous disclosures of fraud." Id.

The FCA prescribes several important limitations on the jurisdiction of courts over *qui tam* suits. The FCA's "public disclosure" provision states:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

The purpose of this jurisdictional bar is to prevent "parasitic lawsuits based upon publicly

disclosed information in which would-be relators seek remuneration although they contributed nothing to the exposure of the fraud . . . [and] to preclude qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." <u>Reagan</u>, 384 F.3d at 173; <u>Laird</u>, 336 F.3d at 351 (citing <u>United States ex rel. Rabushka v. Crane Co.</u>, 40 F.3d 1509, 1511 (8th Cir. 1994)).

Following the statutory framework, the Court must determine (1) whether there has been a "public disclosure" of allegations or transactions; (2) whether the *qui tam* action is "based upon" such publicly disclosed allegations; and (3) if so, whether the relator is the "original source" of the information. <u>United States ex rel. Fed. Recovery Servs., Inc. v. Crescent City E.M.S., Inc.</u>, 72 F.3d 447, 450 (5th Cir. 1995) (citing <u>Cooper v. Blue Cross & Blue Shield of Florida, Inc.</u>, 19 F.3d 562, 565 n.4 (11th Cir. 1994)). Defendants contend that, under this three part test, the Court lacks subject matter jurisdiction over Relator's claims.

The first prong of the jurisdictional test asks whether there has been a "public disclosure" of "allegations or transactions." With respect to the requirement that the allegations or transactions be "publicly disclosed," the statute indicates that a public disclosure occurs when the allegations or transactions are disclosed in "criminal, civil, or administrative hearing[s], in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media." 31 U.S.C. § 3730(e)(4)(A).

The Relator's claims revolve around two false claim allegations: (1) improper joint ventures; and (2) supplier standards violations. Defendants identify several documents which they assert divest this Court of jurisdiction over the Relator's claims.

In 1989, the Department of Health and Human Service's Office of Inspector General ("OIG")

issued a Special Fraud Alert focused on investor referrals to newly formed entities. The OIG was established to "protect the integrity of the Department of Health and Human Services programs as well as the health and welfare of beneficiaries served by them." This statutory mission is carried out through a "nationwide program of audits, investigations, inspections, sanctions, and fraud alerts." The 1989 Fraud Alert was reprinted in the Federal Register in 1994 to identify "national trends in health care fraud . . . and certain practices of an industry-wide character." The Alert was issued upon the OIG being informed of a "proliferation of arrangements between those in a position to refer business . . . and those providing items or services for which Medicare or Medicaid pays." Included among the examples of items or services provided in these arrangements is durable medical equipment. Moreover, the Alert notes that the joint ventures may "involve the creation of a new legal entity by the parties . . . to provide such services" and "some of these joint ventures may violate the Medicare and Medicaid anti-kickback statute." To help readers identify the "suspect joint ventures," the OIG gave the following example of indicators of potentially unlawful activity:

- Investors are chosen because they are in a position to make referrals;
. . .

- In the case of a shell DME joint venture, . . . [the shell DME] owns very little of the DME or other capital equipment; rather the ongoing entity owns them.

- The ongoing entity is responsible for all day-to-day operations of the joint venture, such as delivery of the DME and billing.

The OIG published "Compliance Program Guidance for Third-Party Medical Billing Companies" in the December 18, 1998 edition of the Federal Register. The OIG formulated a voluntary compliance program for Third-Party Medical Billing Companies in an effort to substantially reduce fraud, waste, and abuse. In listing risk areas for ethical concerns for billing

companies, the OIG noted that the proliferation of joint ventures may violate the anti-kickback statute where the arrangement is established between those in a position to refer business and those providing items or services for which a federal health care program pays. Further, the OIG "currently has a number of investigations and audits underway that focus on such areas of concern."

Likewise, the OIG issued "Compliance Program Guidance for the Durable Medical Equipment, Prosthetics, Orthotics and Supply Industry" in July of 1999. In formulating its guidance, the OIG solicited information and recommendations from the DMEPOS industry and their representatives. The OIG "carefully considered those comments, as well as consulted with [Department of Justice], [Health Care Financing Administration], and the durable medical equipment regional carriers in developing a draft compliance program for the DMEPOS industry." Adoption and implementation of voluntary compliance programs "significantly advance the prevention of fraud, abuse, and waste in these health care plans . . . ." The Guidance also lists several areas of special concern for the OIG with regards to DMEPOS suppliers, including: providing incentives to actual or potential referral sources (e.g., skilled nursing facilities) that may violate the anti-kickback statute or other similar federal or state statute or regulation; and joint ventures between parties, one of whom can refer Medicare or Medicaid business to the other. Moreover, the Guidance provides a section on Anti-Kickback and Self-Referral Concerns in an effort to prevent fraudulent conduct on the part of DMEPOS suppliers.

The OIG issued a "Special Advisory Bulletin" regarding Contractual Joint Ventures in April of 2003. The Bulletin specifically focused on

> questionable contractual arrangements where a health care provider in one line of business (hereafter referred to as the "Owner") expands into a related health care business by contracting with an existing provider of a related item or service

(hereafter referred to as the "Manager/Supplier") to provide the new item or service to the Owner's existing patient population, including federal health care program patients. The Manager/Supplier not only manages the new line of business, but may also supply it with inventory, employees, space, billing, and other services. In other words, the Owner contracts out substantially the entire operation of the related line of business to the Manager/Supplier - otherwise a potential competitor - receiving in return the profits of the business as remuneration for its federal program referrals.

The OIG specifically referenced health care facilities establishing a subsidiary to provide DME in exchange for referrals. Moreover, the OIG included characteristics to look for to indicate a prohibited arrangement. Some of those characteristics include:

1. <u>New Line of Business</u>. The Owner typically seeks to expand into a health care service that can be provided to the Owner's existing patient.

2. <u>Captive Referral Base</u>. The newly-created business predominantly or exclusively serves the Owner's existing patient base . . . . The Owner typically does not intend to expand the business to serve new customers (i.e., customers not already served in it main business) and, therefore, makes no or few *bona fide* efforts to do so.

3. <u>Little or No *Bona Fide* Business Risk</u>. The Owner's primary contribution to the venture is referrals . . . .

4. <u>Status of the Manager/Supplier</u>. The Manager/Supplier is a would-be competitor of the Owner's new line of business and would normally compete for the captive referrals.

5. <u>Scope of Services Provided by the Manager/Supplier</u>. . . . In general, the greater the scope of services provided by the Manager/Supplier, the greater the likelihood that the arrangement is a contractual joint venture.

6. <u>Remuneration</u>. The practical effect of the arrangement, viewed in its entirety, is to provide the Owner the opportunity to bill insurers and patients for business otherwise provided by the Manager/Supplier.

7. <u>Exclusivity</u>.

In October of 1994, the Office of Evaluation and Inspections of the OIG published a study on "Medicare Services Provided to Residents of Skilled Nursing Facilities." The Office of Evaluation and Inspections ("OEI") is under the umbrella of the OIG. This entity conducts "short-term management and program evaluations (called inspections) that focus on issues of concern to the Department, the Congress, and the public." The OEI gathered data from skilled nursing facilities

and analyzed their Medicare Part B[4] reimbursement rate to identify weaknesses in the oversight of the program and potential fraud in its management. The report specifically identifies DMEPOS equipment and supplies as an area in which abusive practices are taking place.

The OIG also published a report entitled "Enteral Nutrient Payments in Nursing Homes" in March of 1996. The purpose of this study was to "determine whether Medicare Part B is paying too much for enteral nutrition therapy for nursing home residents." The study concluded that Medicare Part B reimbursements are commonly up to forty-two percent higher than pricing available directly to nursing homes. This is due in part to the fact that up to seventy-five percent of nursing homes do not directly purchase enteral nutrients for residents, but instead allow outside suppliers to provide them and bill Medicare. "Even when a nursing home provides the nutrients (25 percent), it typically acts as a supplier, billing Medicare Part B at current reimbursement levels rather than at or slightly above its actual procurement costs." Moreover, survey results indicate that many suppliers, up to thirty percent, are actually affiliated with the nursing home by contractual relationship (twenty-nine percent) or common ownership (forty-nine percent). The study suggests classifying enteral nutrition as "food," which would facilitate its payment under Medicare Part A, instead of Part B.[5]

In August of 2001, the OIG issued a report prepared by the OEI entitled, "Medical Equipment Suppliers: Compliance with Medicare Standards." That report specifically analyzed whether or not durable medical equipment suppliers who received a supplier number in 1999 were in compliance with Medicare standards. The report determined that less than one percent of suppliers did not have

---

[4]In the report, the phrase "Supplemental Medical Insurance," or "SMI," is synonymous with Medicare Part B.

[5]Under Medicare Part B, enteral nutrition is considered a prosthetic device, which allows it to be supplied by a DMEPOS supplier.

a physical presence at their business address of record, and as many as fifty percent of suppliers did not comply with the standard to provide consumer information.

The Government Accountability Office ("GAO") issued a report in September of 2005 to the Committee on Finance of the United States Senate entitled, "Medicare: More Effective Screening and Stronger Enrollment Standards Needed for Medical Equipment Suppliers." The GAO issued the report in an effort to curb the $900 million improperly paid as a result of fraud by DME suppliers. The report outlines the "21 Standards" that DME suppliers must comply with to be qualified under Medicare and refers to recent prosecutions of fraudulent suppliers that successfully billed Medicare. The GAO's study exposed weaknesses in the National Supplier Clearinghouse's ("NSC") procedures for checking compliance with the 21 Standards and suggested on-site inspections and strengthening the supplier standards to prevent DME supplier fraud.

Defendants also contend that Relator's Disclosure of Material Evidence to the Government, required by 31 U.S.C. § 3730(b)(2), consists of records publicly available. Included in those disclosures is the OIG Special Advisory issued in April of 2003. The disclosures also reference the 1989 Special Fraud Alert published by the OIG. Jamison further relies on the 21 Supplier Standards and a 1996 Durable Medical Equipment Regional Carrier ("DMERC")[6] Medicare Advisory Opinion explaining those standards in greater detail. In fact, Jamison submitted a memorandum explaining the Defendants' alleged fraud, and under the heading "Laws Violated," Jamison lists "OIG Special Advisory: Contractual Joint Ventures" and "[Centers for Medicare & Medicaid Services ("CMS")] Medicare Part B DMEPOS Supplier Standards." He referenced the Palmetto GBA website providing

_____

[6] Medicare Part B DMEPOS suppliers submit bills to Regional Carriers for reimbursement. Palmetto GBA administers payment for DME for the region at issue in this case.

the CMS 21 Supplier Standards, as well as the Mississippi Medicaid Reimbursement Guidelines, Mississippi Secretary of State Business Search records, and cost reports of long-term care facilities submitted to the Mississippi Division of Medicaid.

Plaintiff contends that these purported disclosures are outside any of the statutory list of disclosure categories. Indeed, the statutory language of the FCA defines a public disclosure as any documentation "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media . . . ." 31 U.S.C. § 3730(e)(4)(A).

The touchstone of public disclosure is "potential accessibility by those who are not a party to the fraud." United States of America ex rel. Lam v. Tenet Healthcare Corp., 481 F. Supp. 2d 673, 681 (W.D. Tex. 2006) (citing United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 324 (2d Cir. 1992)). The Fifth Circuit has cited with approval a Third Circuit case defining a Freedom of Information Act request as an "administrative report" because such documentation "constitute[s] official government action," i.e., is administrative, and "provides information and notification regarding the results of the agency's search for the requested documents," i.e., is a report. Reagan, 384 F.3d at 175-76 (quoting United States ex rel. Mistick v. Hous. Auth. Of the City of Pittsburgh, 186 F.3d 376, 383 (3d Cir. 1999)). Black's Law Dictionary also defines "report" as a "formal oral or written presentation of facts or a recommendation for action." BLACK'S LAW DICTIONARY 1414 (9th ed. 2009). Several courts have specifically indicated that documents issued and published by the OIG and other federal agencies constitute "administrative reports" under the FCA. See United States ex rel. Gear v. Emergency Med. Assocs. Of Ill., Inc., 436 F.3d 726, 728-29 (7th Cir. 2006) (OIG reports clearly constitute public disclosures); United States ex rel. Feingold v. Adminastar Fed.,

Inc., 324 F.3d 492, 496 (7th Cir. 2003) (fraud alerts classified as administrative reports because they were issued by an "administrative" agency and constitute official government action of information or notification); Cooper, 19 F.3d at 566 (OIG reports indicating an "ongoing investigation" of fraud constituted administrative reports); United States ex rel. Baltazar, 2009 U.S. Dist. LEXIS 28639, *20 (N.D. Ill. Apr. 2, 2009) (OIG report as "more than sufficient to show a public disclosure"); Gross v. Aids Research Alliance-Chicago, 2004 U.S. Dist. LEXIS 7302, *20 (N.D. Ill. Apr. 27, 2004) (FDA letter considered an "administrative report" because it was government authority addressing the claim in question); United States ex rel. Barrett v. Johnson Controls, 2003 U.S. Dist. LEXIS 5973, *17 (N.D. Tex. Apr. 9, 2003) (administrative reports are any documents which a federal agency issues); United States ex rel. Johnson v. Shell Oil Co., 33 F. Supp. 2d 528, 538 (E.D. Tex. 1999) (same).   Using these parameters and judicial guidance, the Court finds that the following constitute "administrative reports" under the FCA:

- 1989 OIG Special Fraud Alert and its reprint in the 1994 Federal Register;

- December 18, 1998 OIG publication entitled, "Compliance Program Guidance for Third-Party Medical Billing Companies[;]"

- July 1999 OIG report titled, "Compliance Program Guidance for the Durable Medical Equipment, Prosthetics, Orthotics, and Supply Industry[;]"

- April 2003 OIG Special Advisory Bulletin publication regarding contractual joint ventures, which was also included in Relator's core disclosures;

- October 1994 OIG study on "Medicare Services Provided to Residents of Skilled Nursing Facilities[;]"

- March 1996 OIG report entitled "Enteral Nutrient Payments in Nursing Homes"

- 1996 DMERC Medicare Advisory Opinion regarding the 21 Supplier Standards;

- National Supplier Clearinghouse Medicare Part B DMEPOS Supplier Directory;

- August 2001 OIG report entitled, "Medical Equipment Suppliers: Compliance with Medicare Standards[;]" and

- September 2005 GAO report entitled "Medicare: More Effective Screening and Stronger Enrollment Standards Needed for Medical Equipment Suppliers[;]"[7]

In several cases, courts have addressed what "allegations or transactions" must be disclosed for the jurisdictional bar to apply. The Fifth Circuit's decision in United States ex rel. Fried v. West Independent School District, 527 F.3d 439 (5th Cir. 2008), does not directly confront how detailed the public disclosures must be to trigger the jurisdictional bar, but the analysis is instructive. In that case, the relator brought suit against a single Texas school district, alleging that it had defrauded the Social Security Administration through a practice of allowing teachers, who would otherwise not be eligible for Social Security on account of a separate retirement plan, to spend their last day of work in a position not covered by the separate plan. Id. at 440. This allowed them to collect benefits they would not otherwise earn. Id. at 440-41. According to the court, "the very essence of the allegations" made by the relator were already disclosed in a GAO report and congressional hearings regarding the practice; thus, the jurisdictional bar was implicated. Id. at 442. The reports and hearings which constituted public disclosures of the "allegations or transactions" alleged in the

_____

[7]Defendants assert several other documents constitute administrative reports under the FCA. In particular, Defendants claim Palmetto GBA FAQ's on Supplier Standards, as well as state governmental agency records are included in the statutory list of administrative reports under Section 3730(e)(4)(A)'s definition. However, in this case, it is not necessary for this Court to determine whether these documents are administrative reports. Therefore, this Court declines to engage in such analysis.

action focused on the state-wide practice and did not single out the specific school district that was the defendant in the case. The court noted that the defendant's specific school program "was disclosed in trade publications and on the internet." Id. These fora, however, did not qualify as public disclosures under the statutory definition of 31 U.S.C. Section 3730(e)(4)(A). The Fifth Circuit's analysis focused on the governmental hearings and investigations, and it found a public disclosure even though the defendant was not specifically named. Id.

Here, too, the public disclosures have placed the "very essence of the allegations" into the public domain, and they are sufficient to identify particular defendants. The jurisdictional bar is thus implicated. Jamison makes allegations against the largest nationwide skilled nursing facility chain and its associated DME supplier and billing provider. Accordingly, the Government would not face great difficulty in identifying possible perpetrators from these disclosures. The Court therefore finds that the allegations in Jamison's complaint have been "publicly disclosed" for the purposes of the FCA.

The second prong of the jurisdictional test asks whether the *qui tam* action is "based upon" such publicly disclosed allegations. The Fifth Circuit has held that "[a]n FCA qui tam action even *partly* based upon public allegations or transactions is nonetheless 'based upon' such allegations or transactions." Reagan, 384 F.3d at 176 (emphasis added); see also Fed. Recovery Servs., 72 F.3d at 451. Though this Court has determined that the allegations and transactions were publicly disclosed, this Court lacks jurisdiction only if the allegations in the complaint were "based upon" the public disclosures. Reagan, 384 F.3d at 173; Laird, 336 F.3d at 352. A *qui tam* action is based upon public disclosures if it repeats what the public already knows, regardless of whether or not relators learned about the fraud independent of the public disclosures. United States ex rel. Findley v. FPC-Boron

Employees' Club, 105 F.3d 675, 683 (D.C. Cir. 1997). In other words, a *qui tam* action is based upon

public disclosures if the allegations in the complaint are the same as or substantially similar to those

that have been disclosed prior to the filing of the *qui tam* suit. Id. at 687-87 (holding that a court has

no jurisdiction when a complaint "merely echoes publicly disclosed, allegedly fraudulent transactions

that already enable the government to adequately investigate the case and to make a decision whether

to prosecute"); see also Laird, 336 F.3d at 352; Doe, 960 F.2d at 324 ("Public disclosure of the

allegations divests district courts of jurisdiction over *qui tam* suits, regardless of where the relator

obtained his information.").

The Court is required at this juncture to compare the allegations of the Relator's complaint

with the allegations and transactions in the public disclosures. Relator filed his initial *qui tam* action

on December 29, 2004, against hundreds of defendants. The Relator amended his complaint on June

22, 2006. This action remains under seal as to the majority of those defendants. Pursuant to Section

3730(b)(2), the United States elected to intervene in the Relator's action against McKesson

Corporation; McKesson Medical-Surgical Medinet, Inc.; GGNSC Holdings, LLC; Golden Gate

Ancillary, LLC; Beverly Enterprises, Inc.; Ceres Strategies, Inc.; and Ceres Strategies Medical

Services, Inc. Those Defendants were severed from the original action, and this intervention forms

the basis of a new unsealed cause of action. The Government filed a separate complaint against the

named Defendants on October 3, 2008.

There is a disagreement among the parties as to which complaint should be analyzed under

the public disclosure bar. Relator contends this Court should follow the United States Supreme

Court's decision in Rockwell International Corp. v. United States, 549 U.S. 457, 474, 127 S. Ct.

1397, 167 L. Ed. 2d 190 (2007). There, the plaintiff filed a complaint and, thereafter, an amended

complaint. Prior to trial, the parties entered into a final pretrial order that amended some and incorporated other claims. Id., 127 S. Ct. 1397. The Supreme Court held that "[i]n these circumstances, we look to the allegations as amended - here, the statement of claims in the final pretrial order - to determine original-source status." Id., 127 S. Ct. 1397. At this stage, however, the Court is not analyzing Relator's original source status - the Court is analyzing whether Jamison's allegations are "based upon" publicly disclosed allegations or transactions. If this Court were to analyze the Complaint filed in Intervention in this action, the Government's allegations would necessarily be analyzed to determine jurisdiction over the Relator. However, to effectuate the purpose of the FCA public disclosure bar, i.e., prevent recovery by a "parasitic" relator who "contributed nothing to the exposure of the fraud," the Court must analyze the claims the Relator has asserted. Reagan, 384 F.3d at 173. Thus, the Court examines Relator's last amended complaint filed before the Government intervened to determine whether his allegations are based on publicly disclosed allegations or transactions.

Relator's Amended Complaint, filed on June 22, 2006, alleges two claims: (1) improper joint ventures; and (2) violation of supplier standards. Relator contends that "Defendants have entered into illegal joint ventures in order to obtain referrals and increase the amount of money paid to Defendants through Medicare Part B." Moreover, "claims made to Medicare for payment of DME items delivered as a result of or in the course of the operation of such joint ventures are legally and factually false and fraudulent for the reasons set forth in an April 2003 'Special Advisory Bulletin' titled 'Contractual Joint Ventures' as issued by the Office of Inspector General of the United States Department of Health and Human Services." The Relator specified the joint ventures claims as follows:

In many cases, nursing homes and defendant nursing home owners have entered into agreements with the defendant DME companies and defendant DME company owners whereby the defendant DME companies and their owners assist the defendant nursing home and defendant nursing home owners in obtaining a DME provider number so the defendant nursing home owners, or their immediate family members, can provide medical supplies to their own nursing homes through "new" related DME companies and bill Medicare Part B and other federally-funded health care programs for those services. In exchange for the assistance of the defendant DME companies who obtain DME supplier numbers for the defendant nursing home owners, the defendant DME companies are paid a "management" fee by the defendant nursing home owners and/or their "new" related DME companies. These agreements are improper joint ventures and all claims submitted as a result thereon violate the False Claims Act.

The Relator has also alleged that fraudulent claims have been submitted due to violation of the DME supplier standards. In particular, the Relator notes that "DME providers established by the defendant nursing home owners and their immediate family members have not met (and do not meet) the Medicare supplier standards as of the times claims have been (and are) submitted." Further,

[i]n most instances, these DME suppliers have no clients other than the nursing homes owned by the same people who own the DME company, have no physical location whatsoever (apart from a nominal or minimal amount of space in the headquarters of the nursing home owner), maintain no inventory of supplies or equipment, simply "drop ship" products into their client nursing homes, have no employees who instruct beneficiaries as to the proper use of the equipment they provide, and generally exist only to enable the defendant nursing home owners to bill through their own DME companies for DME supplies provided to their nursing homes as a result of operations by others. These "new" DME providers are profitable because they pay little or no rent and have little or no office expenses. All claims submitted by defendant DME companies that do not satisfy Medicare supplier standards constitute violations of the False Claims Act.

As noted above, several of the documents and reports cited by Defendants constitute public disclosures. Relator admits in his Amended Complaint that his joint venture allegations are based on those disclosed in the April 2003 OIG Special Advisory Bulletin. Indeed, as noted above, that report outlined the specific common elements of these "problematic arrangements," which include

the owner of an existing patient population contracting with an existing provider of a related item or service to develop a new company which provides the same item or service as the existing provider to the owner's existing patient population. The Special Advisory Bulletin listed specifically what to look for to identify these joint ventures: (1) the new business primarily serves the owner's existing patient base; (2) the owner neither operates the new business itself nor commits substantial financial, capital, or human resources to the venture. Instead, the owner contracts out substantially all operations of the new business; and (3) the supplier is an established provider of the same services as the owner's new line of business and would normally be considered a competitor of the owner's new business.

Relator's Amended Complaint alleges that Beverly and McKesson formed an illegal joint venture. Medinet, a subsidiary of McKesson, is a supplier of DME and assisted Beverly in setting up its own supplier number and creating CSMS to supply DME to Beverly's existing patient base. Beverly did not commit any financial, capital, or human resource to the venture as evidenced by the cost reports. MediNet would normally be considered a competitor of CSMS. When asked how he learned about the April 2003 Special Advisory Bulletin, Jamison answered, "Off the – on the internet when I was reaching, trying to see if I can do this. That really solidified the data I gathered. It supported that Beverly and – McKesson and Beverly and their – their other suppliers shouldn't be doing this." Thus, but for the publicly disclosed OIG Special Advisory Bulletin, the Relator would not have been notified of the potential fraud involved in the joint venture alleged in his Amended Complaint.

Relator's claims concerning the violation of supplier standards is also at least partially based on public disclosures. The August 2001 OIG report provided notice of the high number of DME

suppliers that are not in compliance with the 21 Supplier Standards. Moreover, the GAO report in

September 2005 outlined the fraud associated with paying out Medicare claims to DME suppliers

not complying with the supplier standards. Both those publicly disclosed documents evidence that

the Government recognized the potential fraud inherent in paying claims of DME suppliers not in

compliance with the 21 Supplier Standards. Thus, Relator's claims regarding the violation of

supplier standards is based on those public disclosures. See United States ex rel. McKenzie v. Bell

South Telecomms., Inc., 123 F.3d 935, 940 (5th Cir. 1997), cert. denied, 522 U.S. 1077, 118 S. Ct.

855, 139 L. Ed. 2d 755 (1998) (defining the term "based upon" to encompass those situations where

the relator's allegations are supported by the publicly disclosed allegations or transactions, even if

the relator was not aware of the public disclosure).

Here, there is no doubt that the allegations in the public disclosures are substantially similar

to those in Jamison's Amended Complaint. The Court accordingly finds that the Relator's suit is

based upon the public disclosures, and it will be barred unless Jamison qualifies as an "original

source."

An "original source" is someone with "direct and independent knowledge of the information"

which forms the basis of his claims, who provides the information to the Government before filing

suit. 31 U.S.C. § 3730(e)(4)(B); Reagan, 384 F.3d at 177. Relators need not be the sole original

source of the information, but must merely be "an" original source of the information. Laird, 336

F.3d at 355. Moreover, within this standard, relators are not required to have direct and independent

knowledge of each false claim in the complaint. Reagan, 384 F.3d at 177. Rather, relators are

required to possess direct and independent knowledge of the information on which the publicly

disclosed allegations are based. Id.

In order to be "direct," the information must be firsthand knowledge. The Fifth Circuit has defined "direct knowledge" as knowledge that was derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand. <u>Reagan</u>, 384 F.3d at 177; <u>Findley</u>, 105 F.3d at 690 (finding direct information means first-hand knowledge). When examining whether or not someone had direct knowledge, the court must strike a balance between those individuals who simply stumble upon lucrative knowledge and those who actually exert some effort to unearth important information about false claims. <u>Reagan</u>, 384 F.3d at 177; <u>Laird</u>, 336 F.3d at 356. "In order to be 'independent,' the information known by the relator cannot depend or rely on the public disclosures." <u>Fried</u>, 527 F.3d at 442-443 (quoting <u>Findley</u>, 105 F.3d at 690).

Jamison has been in the medical equipment business for twenty-two years. He has owned his own Medicare Part B DMEPOS company since 1994. His business involves providing medical equipment, supplies, and services to residents of skilled nursing facilities in Mississippi. As a result of his efforts to market his business, he has been in hundreds of nursing homes throughout Mississippi, including dozens of Beverly facilities. The Amended Complaint states, "Relator has learned, through personal experience, conversations with representatives of Defendants, and conversations in which his employees have participated, that Defendants have entered into illegal joint ventures in order to obtain referrals and increase the amount of money paid to Defendants through Medicare Part B." As an initial matter, the record must show that Jamison did more than apply his expertise to publicly-disclosed information:

> second-hand information may [not] be converted into "direct independent knowledge" simply because the plaintiff discovered through investigation or experience what the public already knew. Instead, the investigation or experience of the relator either must translate into some additional compelling fact, or must demonstrate a new and undisclosed relationship between disclosed facts, that puts a

governmental agency "on the trail" of fraud, where that fraud might otherwise go unnoticed.

Reagan, 384 F.3d at 179.

Jamison admits he has never been employed by Beverly, Ceres Strategies, Golden Gate Ancillary, CSMS, Medinet, or McKesson. He has never entered into a written contract with any of those entities. Moreover, Jamison never reviewed any internal Beverly documents regarding the creation of CSMS, did not know if CSMS had a business plan, did not review any contract CSMS had with Medinet, and did not know whether Beverly had any capital investment in CSMS. Jamison contends that his professional experience as a DME supplier and the information he acquired after conducting his own independent investigation into the joint ventures make him an "original source" of the information underlying his fraud claim.

Specifically, Jamison related that he began his research when a long-time skilled nursing facility customer ended their relationship because MediNet helped them get their own supplier number. He stated that his initial reaction was, "wait a minute, here, if they can do this, why can't I do this. . . . And so I start digging."

He contends that he received information regarding Beverly's business practices directly from administrators and employees at Beverly nursing facilities in Mississippi. He learned of the activities of McKesson and MediNet in Mississippi by visiting and trying to obtain business from nursing homes that utilized the services of McKesson and MediNet. He discovered that Beverly had its own DME supplier number by speaking with several individual employees, although he was unable to name any one specifically. He was also shown, by unidentified employees, Beverly's DME supply stockrooms. He drove to Fort Smith, Arkansas, to inspect the CSMS headquarters himself. He

requested and received cost reports from the Mississippi Division of Medicaid for Beverly Enterprises in 2002 and 2003. Inspection of the cost reports revealed that CSMS had no costs related to operating that business.

In 2005, one of Jamison's employees, Les Barlow, spoke with Gerald Gary the administrator for the Beverly facility in Eupora, Mississippi. Jamison stated:

> Mr. Gray told Mr. Barlow that Beverly had its own DME supplier number; that employees of McKesson, rather than employees of Beverly's DME supplier, provide services related to enteral supplies for residents of Beverly homes; that McKesson provides enteral supplies for both Medicare Part B and non-Medicare patients in Beverly homes; and that Beverly's nursing home staff, rather than any employee of Beverly's DME supplier, assists McKesson in certain tasks related to providing enteral supplies to residents of Beverly's nursing homes.

Jamison also spoke with Ronnie Rutland, a former employee of McKesson, for details on the relationship between McKesson and Beverly.

The Government contends that Jamison provided direct and independent knowledge of phone conversations and site inspections for this claim. In particular, the Government cites to Jamison's telephone conversation with an unidentified CSMS representative who admitted, "we do DME in-house," and, "we have our own supplier number for all Beverly nursing homes." Jamison provided the details of another telephone conversation with a different unidentified CSMS representative who admitted that "McKesson handles everything" for CSMS regarding DME supply. The Government also contends that Jamison's discussions with Beverly personnel regarding the shipment and storage of DME supplies and his observations at the Beverly facilities, including his on-site investigation of CSMS' premises in Fort Smith, Arkansas, is direct and independent knowledge such that this Court does not lack subject matter jurisdiction over his action.

Jamison acknowledges that he brought the original lawsuit against defendants found by

researching nursing homes "on the internet." Particularly, Jamison used the Mississippi and Arkansas Secretary of State websites, as well as the Beverly and McKesson websites, to identify businesses associated with persons who own nursing homes. It was on this website that he saw Ceres Strategies and Ceres Medical Strategies registered under the same owners as Beverly. Jamison admitted that while researching whether a nursing facility can have a DME supplier number, he found the OIG April 2003 Special Advisory Bulletin which "really solidified the data [he] gathered. It supported that Beverly and - McKesson and Beverly and their - their other suppliers shouldn't be doing this." Moreover, Jamison declared when asked about the scope of his research into the contractual joint venture between McKesson Beverly:

> Q:      . . . would you say the information was out there in a lot of places?
>
> A:      Yeah, a lot of individuals know this goes on.

This is not the type of direct or independent knowledge contemplated by the False Claims Act. Jamison merely researched and received information about a relationship that had been publicly disclosed. Jamison's argument that his allegations are unique because they relate to this specific nursing home chain is also insufficient. Jamison argues that without the information he received through his independent investigation, the manner in which these entities were engaged in a joint venture would have gone undetected by Medicare. The record belies this contention. Every aspect of the contractual joint ventures between DME suppliers and nursing facilities was well known - including its potential for abuse by the OIG.

Jamison admitted in his deposition that prior to filing his original complaint, he was not directly aware of any supplier standard violated by CSMS. He noted that his allegations of violations were based on "talking to central supply clerks and nurses, [and] administrators." However, he was

unable to specify any individual he talked to or that provided information. Jamison's claims related to the failure to comply with Medicare's 21 Supplier Standards also do not survive the original source inquiry.

The burden is on Jamison to show that the information and allegations he discovered are "qualitatively different information than what had already been discovered" and not merely the "product and outgrowth" of publicly disclosed information. <u>Fed. Recovery Servs.</u>, 72 F.3d at 452. Jamison has not met this burden. The knowledge that Jamison brings to this case is almost entirely indirect – that is, based on research and review of public records, as well as second-hand interviews with Beverly employees and former employees. <u>See</u> <u>Reagan</u>, 384 F.3d at 179. Jamison's extensive investigation did not put the Government "on the trail" of any new malfeasance; instead, Jamison took disclosures that had already been made by the OIG, and based on his own experience and research, claimed Beverly's relationship with CSMS and McKesson is fraudulent. <u>Id</u>. at 179-80; <u>Laird</u>, 336 F.3d at 356.

Because Jamison has failed to demonstrate that he had direct and independent knowledge of the information on which the allegations are based, there is no need for the Court to analyze whether the Relator voluntarily provided the information to the Government before filing his *qui tam* action. <u>Laird</u>, 336 F.3d at 352.

*Conclusion*

This Court does not have jurisdiction over the Relator's action pursuant to 31 U.S.C. Section 3730(e)(4). The Relator's claim is based on information that has been publicly disclosed, and the Relator is not an original source of that information. Thus, the Defendants' Motions to Dismiss, which this Court analyzed as motions for summary judgment are GRANTED. Relator's Motion for

Partial Summary Judgment is DENIED.

SO ORDERED, this the 25th of March, 2010.

 /s/ Sharion Aycock
**U.S. DISTRICT JUDGE**