IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

UNITED STATES OF AMERICA,
*ex rel.*, THOMAS F. JAMISON                                              PLAINTIFFS

V.                                                       CIVIL ACTION NO. 2:08cv214-SA-JMV

MCKESSON CORPORATION, et al.                                              DEFENDANTS

## MEMORANDUM OPINION

The following motions have been filed in this case:

(1) Motion for Summary Judgment [343] by Beverly Enterprises, Inc., Ceres Strategies Medical Services, Inc. (CSMS), Ceres Strategies, Inc., GGNSC Holdings, LLC, and Golden Gate Ancillary, LLC (collectively referred to as the "Beverly Defendants");

(2) Motion for Summary Judgment [366] by McKesson Corporation;

(3) Motion for Summary Judgment [368] by McKesson Medical-Surgical MediNet, Inc. ("MediNet");

After reviewing the motions, responses, rules and authorities, the Court finds as follows:

*Factual and Procedural Background[1]*

Between 2002 and 2006, Beverly Enterprises, Inc., was one of nine nursing home chains in the United States to own more than one hundred skilled nursing facilities. In order to service those nursing facilities, Beverly contracted with Gulf South for its medical supplies, a contract purportedly valued at $50 million. Beverly also contracted with Pharmerica to supply enteral products to all

---

[1] For an indepth review of the litigation of this case, see United States ex rel. Jamison v. McKesson Corp., 784 F. Supp. 2d 664 (N.D. Miss. 2011) (dismissing supplier standard violation allegations); United States ex rel. Jamison v. McKesson Corp., 2010 U.S. Dist. LEXIS 28562 (N.D. Miss. Mar. 25, 2010), aff'd 649 F.3d 322 (5th Cir. 2011) (dismissing relator); United States ex rel. Jamison v. McKesson Corp., 2010 U.S. Dist. LEXIS 28553 (N.D. Miss. Mar. 25, 2010) (reconsidering some aspects of the order on motion to dismiss); United States ex rel. Jamison v. McKesson Corp., 2009 U.S. Dist. LEXIS 89807 (N.D. Miss. Sept. 29, 2009) (analyzing fraud claims under Rules 9(b) and 12(b)(6)).

Beverly nursing facilities and bill Medicare under Pharmerica's own DME supplier number. Both of these contracts with Beverly expired in 2002.

Ceres Strategies, Beverly's procurement affiliate, set up Ceres Strategies Medical Services, LLC, (CSMS) to supply enteral nutrition, urological, and ostomy products to Beverly's nursing facilities. CSMS applied for and received its own Medicare Part B DME supplier number. This enabled CSMS to bill Medicare and receive reimbursements itself.

As part of the process of applying for its' Medicare Part B DME supplier number in February of 2003, CSMS was required to complete and submit an application to the National Supplier Clearinghouse (NSC). Kevin Roberts, on behalf of CSMS, acknowledged by signing the application that CSMS "underst[ood] that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law) . . . ." CSMS applied for re-enrollment in June of 2006 and again signed the same declaration that payment was conditioned on compliance with the Anti-Kickback Statute.

In the Summer of 2002, Beverly and CSMS executives met with DME contract billing companies to discuss strategies available for CSMS's structure. MediNet executives met with CSMS and Beverly decision makers to pitch billing services for enteral products as well as the benefits of using MMS, McKesson's supply entity dedicated to extended care facilities, as its medical supply distributor.[2] MediNet was a Medicare Part B supplier itself and specialized in billing and collection services since 1991. At the summer meeting with Beverly, MediNet proposed a $50 per resident per month fee for contract billing if Ceres would use MMS to supply its general medical

---

[2]MMS is not a defendant in this action.

equipment. Without the supply contract, however, MediNet would charge $75 per resident per month.

Beverly re-signed its medical supply distribution contract with Gulf South at the end of 2002.

2003 RFP Process

In the Fall of 2002, CSMS solicited requests for proposals to perform "billing plus" services for enteral nutrition with full assignment for non-enteral supplies. The RFP provided that the prospective billing agent would bill Medicare for enteral nutrition products under CSMS's supplier number, perform related field services, and provide non-enteral supply services on a full assignment basis. The winning bidder would have to coordinate ordering and delivery of products to the skilled nursing facilities with Gulf South. Four bids were submitted. The bids were as follows: MediNet - $75 per resident per month, or $50 per resident per month if CSMS used MMS for distribution; Pharmerica - $210 per resident per month; NCS - $50 per resident per month; and Proclaim - $74 per resident per month. Some of the bids included tracking fees and minimum fees for monthly visits to facilities with less than a certain number of eligible residents.

Janet Houston testified that CSMS determined it would prefer McKesson as its billing agent, so she called and further negotiated with MediNet to reduce their final price from $75 to $70 per resident per month. CSMS contends MediNet was selected as their billing agent because the bid was competitively priced, MediNet had substantial experience, and enough resources to service each of Beverly's facilities, and its "days sales outstanding" rate was low. On February 25, 2003, CSMS and MediNet entered into a three year Services Agreement for enteral contract billing and full assignment non-enteral products.

Shortly after CSMS received its supplier number in 2003, the Office of the Inspector General

3

(OIG) issued a Special Fraud Alert warning that certain joint ventures could violate the False Claims Act and Anti-Kickback Statute. David Beck, Beverly's head in-house counsel, contacted Mark Fitzgerald of the Washington, D.C. area law firm Powers, Pyles, Sutter & Verville, for an outside legal opinion on whether Beverly's arrangement between CSMS and MediNet could potentially qualify as a joint venture pursuant to the guidance given in the Special Fraud Alert. According to Fitzgerald's July 9, 2003 opinion letter, the CSMS-MediNet pairing was not a suspect contractual joint venture but a legitimate outsourcing arrangement. After explaining that the fee MediNet charged could affect the assessment of risk for CSMS under the Anti-Kickback Statute, Fitzgerald recommended that the competitive bids received by CSMS for the billing service contract be analyzed to determine whether the information was "adequate to demonstrate the fair market value of the MediNet arrangement."

Also during the term of the 2003 Services Agreement, a MediNet financial analyst reviewed the impact of the Beverly contract to MediNet and determined that at $70 per resident per month, MediNet either lost money or, at best broke, even in servicing the contract.

2006 RFP Process

Amid talk of a hostile takeover of Beverly by another corporation, Gulf South declined to renew its contract for medical supplies with the skilled nursing facility conglomerate in the Fall of 2005. In September of 2005, Ceres sent out RFPs to identify a replacement distributor for all Beverly skilled nursing facilities' medical supplies. McKesson entered a bid on the medical supply contract, but that contract was awarded to Medline.

On February 27, 2006, Ceres posted a Request for Information on billing agent services for enterals and full assignment of Beverly's non-enteral business. Six entities were solicited to submit

4

bids. MediNet initially quoted $70 per resident per month for Part B billing, the same fee charged under the 2003 Services Agreement. Medline bid $60 per resident per month for the same billing services. After those bids were received, Janet Houston sent out additional information and requested pricing under three different scenarios: (1) monthly visits to all facilities; (2) monthly visits to all facilities identified as high users;[3] and (3) quarterly visits to all facilities. Beverly also separated the enteral DME supply business from the general medical contract. MediNet submitted a best and final bid of $68 to visit all Beverly facilities monthly; $60 to visit monthly facilities identified as high users; and $50 for quarterly visits to all facilities. As to the three scenarios, Medline quoted $60 to visit all facilities monthly; $55 to visit monthly facilities identified as high users; and $50 for quarterly visits to all facilities.

In late March, 2006, CSMS discussed with MediNet the possibility of reducing their bid. MediNet returned with the final price of $55 per patient per month for monthly visits to all facilities with five or more enteral patients with MMS distributing the DME supplies. CSMS awarded the three year contract to MediNet at that price.

Government's Allegations

As to the 2003 contract, the Government asserts the Beverly Defendants "dangled" the prospect of McKesson obtaining its DME supply business relating to enteral nutrition services in order to induce MediNet to provide it with the lowest possible billing fees. MediNet, the Government contends, offered its contract billing services below fair market value in order to induce Beverly to refer the general medical supply contract to MMS. With regard to the 2006 transaction, the Government asserts the Beverly Defendants "carved out" enteral supplies from its general

---

[3]The term "high users" has been identified as facilities with five or more enteral patients.

5

medical bid and issued a separate, stand alone proposal for the enteral DME supply business, as well as for the Part B billing services and non-enteral supply, for which MediNet decreased its billing fee in order to secure both contracts.

The Defendants seek summary judgment of the Government's claims against them.

*Summary Judgment Standard*

Summary judgment is appropriate if the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations, . . . admissions, interrogatory answers, or other materials; or
>
> (b) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial" and "mandates the entry of summary judgment" for the moving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Summary judgment is also mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id., 106 S. Ct. 2548.

*Discussion and Analysis*

The False Claims Act imposes civil liability on any who "knowingly presents, or causes to be presented, to an office or employee of the United States Government . . . a false or fraudulent

claim for payment or approval," 31 U.S.C. Section 3729(a)(1) (2008), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. Section 3729(a)(1)(B) (2010).

In order to establish a violation of the False Claims Act, a plaintiff must show by a preponderance of the evidence that: (1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the Government to pay out money or to forfeit moneys due (i.e. that involved a claim). United States ex rel. Longhi v. Lithium Power Tech. Inc., 575 F.3d 458, 467 (5th Cir. 2009) (citing United States ex rel. Wilson v. Kellog Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008) (citations omitted)).

There are two categories of false claims under the FCA: a factually false claim and a legally false claim. United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc., 543 F.3d 1211, 1217 (10th Cir. 2008). A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government, and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment. Id. A legally false FCA claim is based on a "false certification" theory of liability. See Rodriguez v. Our Lady of Lourdes Med. Ctr., 552 F.3d 297, 303 (3d Cir. 2008), overruled in part on other grounds by United States ex rel. Eisenstein v. City of New York, 556 U.S. 928, 129 S. Ct. 2230, 173 L. Ed. 2d 1255 (2009). There is a further division of categories of claims as some courts have recognized that there are two types of false certifications, express and implied. See, e.g., Conner, 543 F.3d at 1217. Under the "express false certification" theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds. Rodriguez, 552

F.3d at 303. Thus, "where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claims when he or she falsely certifies compliance with that statute or regulation." United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997) (false certification on annual cost reports that entity is compliant with anti-kickback statute can establish FCA liability).

The Fifth Circuit has not explicitly recognized the validity of the "implicit false certification" theory, and this Court will not do so here. See United States ex rel. Willard v. Humana Health Plan of Texas Inc., 336 F.3d 375, 382 (5th Cir. 2003). Therefore, whether the Defendants submitted, or caused to be submitted, a "false claim" depends on whether the Anti-Kickback Statute was violated, as acknowledged by the certification of compliance on the DME enrollment and re-enrollment applications.

> The AKS provides criminal penalties to those who
>
> knowingly and willfully solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . .in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b).

According to the Government's theory, compliance with the Anti-Kickback Statute, 42 U.S.C. Section 1320a-7b, is a precondition for Medicare reimbursement and thus, the McKesson Defendants, in providing the alleged kickbacks, and Beverly Defendants in willfully receiving those supposed kickbacks, caused false or fraudulent claims to be submitted and paid by the Government.

8

2003 Transaction

Initially, the Court must determine whether there was any "remuneration" as required by the statute. The Beverly Defendants claim that because MediNet's bid was in line with fair market value, there was no remuneration. The Government counters that each bidder was motivated to bid low in hopes of landing the opportunity to furnish the medical supplies to the Beverly-affiliated string of skilled nursing facilities, therefore, MediNet's bid was below fair market value.

Whether Beverly received remuneration for potential referrals, and MediNet offered any remuneration, depends on the fair market value of the service rendered by MediNet. The Government asserts because CSMS determined bringing enteral billing in house would be "cost prohibitive," and MediNet at best broke even, but more likely lost money on the contract billing portion of the 2003 transaction, the $70 per resident per month billing fee was below fair market value. Defendants argue that the competitive bidding of the RFP process ensures that MediNet's pricing was fair market value, regardless of the Government expert's hindsight calculations. The parties have presented genuine issues of material fact as to whether there was any remuneration under the 2003 transaction.

The second and third prongs necessary to establish an FCA violation - - knowledge and materiality - - likewise require a factual development on the record. The Government contends that Janet Houston did not notify McKesson that they were not going to receive Beverly's medical supply business until January of 2003, four months after the original "billing plus" bid. Furthermore, the Government asserts that the Defendants had the requisite scienter because MediNet's bid for the Part B "Billing Plus" arrangement with CSMS was unreasonable. Among its many arguments, the Government notes that CSMS's acknowledgment that bringing the Part B

9

billing in house would be "cost prohibitive" and Janet Houston's analysis that with the expansive scope of services in the 2003 bid, the bids would likely be too high for CSMS to generate a profit. Moreover, the Government contends that MediNet's bid of $70 per resident per month in 2003 should have been more in line with the $210 per resident per month bid of Pharmerica, the entity who had been performing those full assignment services for years past, in order to be a fair determination of the value of those services. MediNet produced and relies on the profit projection analysis made prior to entering into the 2003 Services Agreement showing a substantial profit being made at $70 per resident per month. Gail Beske noted that at the time of the bid, MediNet anticipated its costs per claim between $34 and $38, well in line with the $70 per resident per month fee.

The Beverly Defendants argue that its negotiations and determination of the best bid was driven by their intent to get the best deal, with the understanding that MediNet was chosen as their Part B billing services provider on the basis of other criteria aside from price. Further, Beverly's in-house counsel sought out legal advice from outside counsel in an effort to comply with the OIG's Special Fraud Alert regarding joint ventures. Moreover, at the time of the 2003 RFP, Gulf South had recently been awarded a three year contract on medical and surgical supplies for Beverly's skilled nursing facilities.

Whether the Beverly Defendants knowingly and willfully received remuneration in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, and whether MediNet offered remuneration for such improper purpose, is a question of fact more appropriate for disposition at trial. Therefore, to determine whether the Beverly Defendants violated

the AKS thus resulting in a "false claim," a presentation of the facts is necessary.

 2006 Transaction

 As with the 2003 transaction, to determine whether a discount was offered for the referral of business with regard to the 2006 transaction, the Court must engage in an analysis of the value of MediNet's service. The parties have suggested various methods to determine fair market value of a service such as contract billing. For instance, the Government's expert suggests a retrospective analysis of MediNet's profitability, while MediNet urges the Court to analyze the competitive bidding process. Because of the numerous factual issues to be determined in order to accurately determine the fair market value of MediNet's contract billing services, the Court must defer resolution of this query until the trial.

 MediNet contends that regardless of whether the Court finds the price charged to be fair market value, it is exempted from the penalties of the Anti-Kickback Statute because of the statutory and/or regulatory discount safe harbor.

 The AKS provides that "a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program" shall not constitute illegal remuneration "if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(3)(A).

 Under Medicare Part B, and particularly in light of the prospective payment system of that program, the Government contends that the statutory discount safe harbor does not apply. Indeed, the only statutory requirements for the safe harbor are that the discounts be disclosed and reported. There is no dispute that neither the Beverly Defendants or MediNet had any duty to disclose or

report the alleged "discount" provided by MediNet, as no cost report is required for subcontracted services. Accordingly, based on the plain language of the statute, the statutory discount safe harbor does not apply.

The AKS also contains a provision allowing the promulgation of regulatory safe harbor provisions, 42 U.S.C. § 1320a-7b(b)(3)(E), and MediNet seeks to stretch the discount safe harbor regulation to apply in this circumstance as well. The provision MediNet invokes exempts discounts from criminal prosecution if the buyer provides "upon request by the Secretary or State agency, information provided by the seller" regarding the buyer's obligation to report such discount and provide information to those entities. 42 C.F.R. § 1001.952(h)(3)(A). However, the term "discount" is defined in those regulations to exclude reductions in price "applicable to one payer but not to Medicare, Medicaid or other Federal health care programs" or "[s]ervices provided in accordance with a personal or management services contract." 42 C.F.R. § 1001.952(h)(5)(iii), (vi).

Based on this regulatory language, the Court will not extend a safe harbor regulation to a purported discount where Medicare does not receive the benefit of the reduction in price offered to CSMS. The discount safe harbor provisions, both statutory and regulatory, do not apply to this case.

<u>Res Judicata</u>

In addition to arguing there are no genuine issues of material fact regarding the claims against them, Defendants urge the Court to dismiss this action on the basis of res judicata or collateral estoppel. Defendants assert that because CSMS's compliance with the Supplier Standards has been previously established in prior adjudications, the Government should be precluded from urging these claims against them here. The Court has read and considered these arguments in a prior motion. However, the Court explicitly denies the Defendants' requests again.

Under res judicata or claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Hargrove v. Barclays Capital Real Estate, Inc., 385 Fed. Appx. 418, 419 (5th Cir. 2010) (quoting Oreck Direct, LLC v. Dyson, Inc., 560 F.3d 398, 401 (5th Cir. 2009)). A claim is barred by the doctrine of res judicata if the following four requirements are met: "(1) the parties must be identical in the two actions; (2) the prior judgment must have been rendered by a court of competent jurisdiction; (3) there must be a final judgment on the merits; and (4) the same claim or cause of action must be involved in both cases." Oreck Direct, 560 F.3d at 401 (internal quotation marks and citation omitted).

The prior administrative proceedings engaged in between CSMS and the NSC do not preclude the litigation of the AKS claims because such action was not "rendered by a court of competent jurisdiction" and does not constitute a "final judgment on the merits." There were no "findings of fact" as to the AKS and the final disposition was more akin to a settlement than an adjudication. Further, neither MediNet nor McKesson were involved in the administrative proceeding and no evidence has been put forth that those entities would be subject to NSC jurisdiction.

This Court dismissed the Government's contentions regarding willful submissions of false claims based on violations of the supplier standards because, according to the administrative proceedings and the NSC's determination that CSMS complied with those standards, the claims were submitted in good faith. This determination has no preclusive effect on whether the claims submitted by the Defendants in this case violated the AKS. See McKesson Corp., 784 F. Supp. 2d at 681 (specifically noting that the ruling is not indicative of whether false claims were submitted

13

for AKS violations).

Moreover, this case has now been pending almost eight years. Over sixty depositions have been taken and hundreds of thousands of pages of discovery exchanged between the parties. The NSC has been charged with verifying compliance with the 21 Supplier Standards and certifying suppliers. Litigation of False Claims Act and Anti-Kickback Statute violations to the extent necessary to prohibit the Government from recovering a judgment on the basis of fraud is too burdensome for the administrative agency. Thus, Defendants' arguments that res judicata applies are denied.

McKesson Corporation Summary Judgment

McKesson Corporation also seeks summary judgment on the basis that McKesson, as MediNet's parent corporation, is not liable for the actions of its subsidiary, MediNet. Indeed, McKesson asserts that it was not a party to any of the transactions, is not a Medicare provider or supplier, does not submit claims to Medicare, and does not directly own any MediNet shares. Thus, McKesson seeks to be dismissed from this lawsuit.

McKesson Corporation was not a party to either the 2003 or 2006 transaction and asserts that McKesson had no participation or control over MediNet's actions. The Government asserts that McKesson had input into the strategy for securing Beverly's business, that a senior McKesson executive was over the management of MMS at the time the "Beverly strategy" was implemented, and that the McKesson executive had knowledge of and approved MediNet's strategy. Further, the Government cites to McKesson's deliberate corporate strategy to blur MMS and MediNet into the McKesson corporate name as evidence of McKesson's direct involvement with the fraud.

Both parties cite United States v. Bestfoods, 524 U.S. 51, 118 S. Ct. 1876, 141 L. Ed. 2d 43

14

(1998) to support their contentions regarding the liability of a parent corporation under the False Claims Act. The Supreme Court outlined that

> [i]t is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.

Bestfoods, 524 U.S. at 61-62, 118 S. Ct. 1876 (citations omitted). Here, however, it is uncontested that McKesson Corporation does not own any MediNet stock. Indeed, McKesson acquired Red Line in 1998 and converted its name to McKesson Medical-Surgical Minnesota, Inc. That entity is the direct owner of both MediNet and MMS.

The question whether to disregard corporate form, expressed most simply, requires the following analysis: (1) whether there is such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) whether an inequitable result will follow if the acts are treated as those of the corporation alone. Relevant to the first question is the issue of the degree to which formalities have been followed to maintain a separate corporate identity. The second question looks to the basic issue of fairness under the facts. United States ex rel. Debra Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 60-61 (D.D.C. 2007) (citing Labadie Coal Co. v. Black, 672 F.2d 92, 97 (D.C. Cir. 1982)).

A court can pierce the veil between the parent and subsidiary only where the parent "so dominated the subsidiary corporation as to negate its separate personality." AGS Int'l Servs. S.A. v. Newmont USA Ltd., 346 F. Supp. 2d 64, 89 (D.D.C. 2004); see also United States ex rel. Kneepkins v. Gambro Healthcare, Inc., 115 F. Supp. 2d 35, 39-40 (D. Mass. 2000) (in FCA case, "the veil may be pierced only if the parent and subsidiary lacked independence, the principals conducted their affairs with a requisite degree of 'fraudulent intent,' and failure to pierce the veil

15

would work substantial injustice.") (citing United Elec., Radio and Machine Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1093 (1st Cir. 1992)). In such a case, the subsidiary is deemed to be the parent's alter ego, agent, or mere instrumentality.

Paul Julian, McKesson senior Vice President, and later Executive Vice President, was over the Extended Care branch of McKesson Medical-Surgical Minnesota. In that role, the Government contends, Julian's oversight of MediNet's financial goals, "decisions of substance," and key business issues is proof of McKesson's intermeddling with MediNet's affairs. Although Julian could not recall this position, Gary Keeler testified that in mid-2002, for a short period of time, Julian was the interim President of MMS. Even in his position at McKesson, Julian was continually apprised of the profitability of the Beverly contract. Moreover, the Government asserts that McKesson employed a "deliberate corporate strategy to emphasize MMS and MediNet's affiliation with McKesson Corporation in all of their business dealings." Further, the Government notes that Beverly personnel understood that they were dealing with McKesson and did not differentiate. As further proof of the blurring of corporate form, the Government points to MediNet's power point presentation to the Beverly executives which contains the McKesson logo on each slide.

Here, there is a genuine issue of material fact as to the level of control and input McKesson Corporation had with respect to MediNet's contract with CSMS. Thus, summary judgment as to the Government's claims against McKesson Corporation is inappropriate.

*Conclusion*

Genuine issues of material fact remain as to the Defendants' liability under the False Claims Act for alleged Anti-Kickback Statute violations. For the foregoing reasons, all motions for summary judgment are denied.

SO ORDERED, this the 14th day of February, 2012.

                                       **/s/ Sharion Aycock**
                                       **U.S. DISTRICT JUDGE**