IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

UNITED STATES OF AMERICA,
*ex rel.*, THOMAS F. JAMISON                                        PLAINTIFFS

V.                                              CIVIL ACTION NO. 2:08cv214-SA-JMV

MCKESSON CORPORATION, et al.                                        DEFENDANTS

FINAL JUDGMENT

A bench trial of this matter commenced February 21, 2012. After fourteen days of trial,

twenty-four witnesses, hundreds of exhibits, and post-trial briefing, the Court is ready to finally

adjudicate this case. Because the Government has failed to carry its burden of proof that Defendants

violated the Anti-Kickback Statute or False Claims Act, judgment is entered in favor of Defendants.

*Procedural History*

In December 2004, Thomas Jamison filed a sealed *qui tam* complaint under the False Claims

Act (FCA) against approximately 450 defendants, ranging from individual nursing homes, nursing

home chains, nursing home management companies, durable medical equipment (DME)[1] suppliers

and billers, as well as the owners and employees thereof. He alleged those persons and entities

presented false claims to Medicare and Medicaid in three ways: (1) forming improper joint ventures

to defraud the Government; (2) violating the supplier standards required by DME suppliers; and (3)

submitting fraudulent Medicaid Cost Reports. See United States ex rel. Jamison v. Beverly of

Tupelo, et al., No. 2:04cv355-SA-DAS [19] (N.D. Miss. June 22, 2006). The Relator's amended

---

[1]The acronym "DMEPOS" stands for durable medical equipment, prosthetics, orthotics, and supplies, and is commonly abbreviated "DME." Items considered as DMEPOS are "equipment furnished by a supplier or a home health agency that--(1) can withstand repeated use; (2) is primarily and customarily used to serve a medical purpose; (3) generally is not useful to an individual in the absence of an illness or injury; and (4) is appropriate for use in the home." 42 C.F.R. § 414.202 (2003).

complaint specifically alleged that medical supply companies that sold DMEPOS formed and organized DME suppliers within nursing homes. These newly formed suppliers then contracted the DME supplies and supplier functions from the organizing entity, allowing the nursing home owners to seek reimbursement under their own DME supplier number. This enabled the nursing homes to capture the substantial profits available under the Medicare reimbursement plan, especially from the provision of enteral nutrition supplies. The Relator contended that the profits realized by the nursing home owners were kickbacks, therefore, all claims submitted under the DME numbers were false, in violation of the False Claims Act. The Relator also argued that because the newly-organized in-house DME suppliers did not comply with the supplier standards outlined by Department of Health and Human Services regulations, all claims submitted were false in violation of federal statute. In addition, the Relator asserted that because expenses related to the DME entities based out of the nursing homes were not "backed out" of the Medicaid cost reports, claims by those facilities were false under the FCA. After numerous extensions of the sixty-day period allowed under 31 U.S.C. Section 3730(b)(3), the Government intervened against the Defendants here, a new unsealed case was opened, and an amended complaint was filed.

The Defendants filed motions to dismiss based on Federal Rules of Civil Procedure 9(b) and 12(b)(6). The Court analyzed the claims with regard to the Amended Complaint filed in civil action 2:08cv214-SA-JMV, as all complaints filed in civil action 2:04cv355-SA-DAS were still being investigated and were under seal. Therefore, Defendants had no knowledge of the allegations contained therein, and Plaintiffs had narrowed the claims alleged to those against these particular Defendants in the more recent case. The Court found that the Government asserted with sufficient particularity the allegations of the Amended Complaint thus complying with Federal Rule of Civil

Procedure 9(b), and sustained its burden under Rule 12(b)(6) in civil action 2:08cv214-SA-JMV. United States ex rel. Jamison v. McKesson Corp., 2009 U.S. Dist. LEXIS 89807, 2009 WL 3176168 (N.D. Miss. Sept. 29, 2009).

Thereafter, the Defendants filed motions for partial summary judgment challenging the Court's subject matter jurisdiction over the Relator and his claims. The Court granted those motions finding that the Relator's claims were based on publicly disclosed information of which Thomas Jamison was not the original source. United States ex rel. Jamison v. McKesson Corp., 2010 U.S. Dist. LEXIS 28562, 2010 WL 1276712 (N.D. Miss. Mar. 25, 2010). Accordingly, the Court dismissed the Relator. Jamison appealed to the Fifth Circuit which affirmed the outcome that the district court lacked jurisdiction under 31 U.S.C. Section 3730(e)(4) . United States ex rel. Jamison v. McKesson Corp., 649 F.3d 322 (5th Cir. 2011).

The Defendants next filed motions for partial summary judgment seeking dismissal of the Government's allegations of false claims submitted due to supplier standard violations. The Court granted those motions finding that Defendants' good faith reliance on National Supplier Clearinghouse (NSC) and Centers for Medicare and Medicaid Services' (CMS) determinations of compliance with the supplier standards precluded those claims as being deemed "false." United States ex rel. Jamison v. McKesson Corp., 784 F. Supp. 2d 664 (N.D. Miss. 2011). The Court denied Defendants' contention that the determinations of compliance also estopped adjudication of the alleged Anti-Kickback Statute (AKS) violations here.

Finally, the Defendants filed motions for summary judgment seeking dismissal of the remaining claims in this case. The Court denied those motions finding that there were genuine disputes of material fact as to the Defendants' liability under the False Claims Act for alleged AKS

violations. <u>United States ex rel. Jamison v. McKesson Corp.</u>, 2012 U.S. Dist. Lexis 17856, 2012 WL 487998 (N.D. Miss. Feb. 14, 2012).

<em>Allegations at Issue</em>

The Government brings this action on behalf of the Department of Health and Human Services and the CMS against McKesson Corporation; McKesson Medical-Surgical MediNet, Inc.; McKesson Medical-Surgical MediMart, Inc.; GGNSC Holdings, LLC; Golden Gate Ancillary, LLC; Beverly Enterprises, Inc.; Ceres Strategies, Inc.; and Ceres Strategies Medical Services, LLC.[2]

McKesson Corporation is a global healthcare company primarily based out of San Francisco, California. McKesson's subsidiary, McKesson Medical-Surgical Minnesota, and in particular, its Extended Care branch (Extended Care), was the entity directly over the companies allegedly involved in this action - MediNet, MediMart, and Minnesota Supply (MMS).[3] MediNet and MediMart both supplied DMEPOS on a full assignment and a contract billing basis.[4] Under a full assignment, the nursing homes contracted with a third party DME supplier, i.e., MediNet, to order, deliver, and bill for DME supplies and services. When MediNet was the full assignment provider for a nursing facility, MediNet used MMS to distribute the supplies. MMS, as a subsidiary of the same parent company as MediNet, was able to access the same software for patients' information and orders. In a full assignment situation, the nursing home would receive no direct reimbursement

---

[2]For ease of reference, throughout this opinion, the Court will refer to McKesson Corporation, McKesson Medical-Surgical MediNet, Inc., and McKesson Medical-Surgical MediMart, Inc., as the "MediNet Defendants" or simply "MediNet" unless further differentiation is required. Likewise, the Court will refer to the remaining defendants as the "CSMS Defendants" or "CSMS."

[3]MMS is not a defendant in this case.

[4]MediNet and MediMart have since been consolidated.

from Medicare. As a contract billing company, MediNet also offered to its customers the option of using a third party supplier to supply the DMEPOS while contracting with MediNet to bill Medicare for those products under the DME supplier number of the customer. In this way, the customers were able to receive direct reimbursement from Medicare. MediNet performed both full assignment and contract billing work; however, prior to 2003, MediNet never performed contract billing work where the third party supplier was not MMS.

Ceres Strategies Medical Services (CSMS) is the in-house DME supplier organized within the Beverly nursing home conglomerate. GGNSC Holdings, LLC, and Golden Gate Ancillary, LLC, have since acquired the Beverly Enterprises, Inc., properties and assumed the liability for that entity. CSMS and MediNet entered Services Agreements in 2003 and again in 2006 for the provision of non-enteral DMEPOS on a full assignment basis, and contract billing for CSMS's enteral DME needs.

The Government's remaining claims have evolved over the course of this litigation to now include:

Count 2: Presenting or causing to be presented, false claims in violation of the FCA based on Anti-Kickback Statute violations relating to illegal remuneration for business referrals in the form of below market value pricing or discounts;

Count 4: Conspiring to submit false claims in violation of the FCA between the CSMS Defendants and the MediNet Defendants based on those AKS violations;

Count 5: Using false records or statements, or causing false records or statements to be made, to get false claims paid in violation of the FCA based on the same AKS violations; and

Count 6: Unjust enrichment based on the prior misconduct.

In relation to the 2003 Services Agreement and negotiations for that contract between CSMS and MediNet, the Government contends that CSMS "dangled" the prospect of McKesson receiving the Beverly nursing homes' general medical supply contract in order to get the contract billing services below fair market value, below actual costs, or at a discounted price. Likewise, the Government asserts that because of the possibility of receiving the general medical supply contract, MediNet lowered its price on contract billing to below fair market value or actual costs, or offered a discount on those services.

As for the 2006 transaction, the Government argues that CSMS "carved out" enteral supply distribution from its general medical supply contract in order to induce MediNet to provide below fair market value, below actual cost, or discounted prices on its contract billing services beginning in 2006. Conversely, the Government alleges that MediNet offered below fair market value, below actual cost, or discount pricing in order to induce CSMS to award McKesson the general medical supply or enteral supply business.

*Findings of Fact*

Medicare Part A covers hospital, nursing home, hospice and home healthcare for the first one hundred days in a skilled nursing facility. Part A pays a per diem amount based on average costs in the region. Part B, which is a supplemental medical insurance benefit plan, covers medically-necessary supplies, including durable medical equipment, prosthetics, orthotics and services. Under Part B, benefits are paid according to a predetermined fee schedule. DMEPOS, which is covered by Part B, can be further broken down into enteral and non-enteral products. Enteral products encompass supplies offering nutritional support, while non-enteral supplies are products that offer no nutritional support. While non-enteral supplies are reimbursed based solely on the predetermined

6

cost of the product, enteral products are reimbursed based on the cost of the product plus the costs associated with the use of those products, including the cost of checking pumps, inserting feeding tubes, as well as the high cost of shipping.

Around 2002, Medicare restructured its reimbursement strategy to be implemented at a later date for qualified Part B services and supplies. Jeff Freimark, Chief Financial Officer of Beverly Enterprises, Inc., during 2002, testified that prior to the "Medicare Cliff," as this shift was internally referred, Beverly was struggling financially, and the implementation of the new reimbursement rates was projected to cause a $14 million shortfall to Beverly's 2003 operating budget. Chris Roussos was hired as a Beverly executive during this time to change the corporate culture of that entity. Due to the extremely tight margins in the nursing facility field, Roussos was tasked with maintaining profitability and staying out of bankruptcy, as other national chains were increasingly forced to do during this time. Prior to and during the pertinent time periods at issue in this case, Beverly Enterprises, Inc., owned and operated a significant number of skilled nursing facilities (SNF) nationwide. Along with revamping the procurement process, Roussos also encouraged the selling off and consolidation of under-performing SNFs. As a result of his initiative, Beverly's numbers fluctuated during the time period at issue between five hundred and three hundred homes. Roussos set out to review and re-examine the internal structure, as well as all external contracts in order to reduce costs.

Since the early 1990s, Beverly contracted with Gulf South to furnish the general medical supplies of Beverly's hundreds of nursing facilities. This contract was rumored to be worth $50 million. In fact, throughout MediNet and McKesson internal communications regarding Beverly's general medical supply contract, it is often referred to as the "$50 million contract."

7

McKesson Corporation, as a national healthcare supply and service provider, was interested in supplying the general medical needs of the Beverly SNFs and aggressively pursued the opportunity to do business with Beverly. Several entities under the McKesson umbrella were involved in enticing Beverly. Pertinent here is McKesson subsidiary, McKesson Medical-Surgical Minnesota - Extended Care's two branches, MediNet and Minnesota Supply (MMS). MediNet, an Oregon-based company, was originally part of RedLine, which was acquired by McKesson in 1998. MediNet functioned as a DME supplier using MMS, another McKesson entity, as a distributor. MediNet additionally offered its expertise in billing Medicare to customers intent on using third party suppliers for their DMEPOS needs. These services are commonly referred to as contract billing services.

During the period of time leading up to the 2003 Services Agreement, Carol Muratore was the President of Extended Care; Gail Beske was the Vice President of Reimbursement Services of Extended Care, of which MediNet was a subsidiary; and Curt McLeod was the founder of MediNet prior to its acquisition by McKesson.

*2003 Transaction*

Ceres Strategies, Inc., the procurement arm of Beverly Enterprises, Inc., formed CSMS in response to the "Medicare Cliffs." Janet Houston, CSMS Director of Operations, was tasked with investigating and determining the steps necessary for CSMS to acquire its own DMEPOS supplier number. As a DMEPOS supplier with its own supplier number, CSMS could capture reimbursement from Medicare directly, instead of having to engage a third party supplier.

For the fifteen years prior to CSMS's formation, Pharmerica supplied DMEPOS to Beverly's patient base on a full assignment basis. Full assignment means that the nursing homes contracted

8

with a DME supplier to order, deliver, and bill Medicare for those supplies and services. Using a full assignment vendor, Beverly and CSMS would not receive direct reimbursement from Medicare. The Pharmerica full assignment contract was set to expire in December 2002. Also set to expire around that same time was the $50 million general medical supply contract for all Beverly SNFs. On the basis of presentations from service providers in the summer of 2002, CSMS decided to contract out a significant number of the functions of a DME supplier. Thus, as opposed to a full assignment, CSMS sought to engage a contract biller. Under this system, CSMS would seek reimbursement directly from Medicare using its own DME supplier number and pay another entity, the contract biller, to service those products and fill out the Medicare paperwork on CSMS's behalf. Because CSMS was in its infancy when the Pharmerica contract expired, a Request for Proposals (RFP) was drafted in order to determine the price CSMS would have to pay to outsource those functions and convert Beverly SNF's enteral nutrition needs from full assignment to contract billing. Specifically, CSMS sought a DME supplier to take over the non-enteral supplies full assignment, and perform contract billing functions using an outside supplier for enterals. CSMS also required the winning bidder to provide tracking services for patients qualified under Part A who might later qualify for Part B.

The RFP informed bidders that the Beverly SNFs serviced 1700 residents with enteral nutrition needs, averaging 4.1 residents per facility. The following bids were received by CSMS: (1) ProClaim - $74.00 per resident per month, $15.00 per resident per month tracking fee, and a $250.00 per month minimum fee for facilities with less than four enteral patients; (2) MediNet - $75.00 per resident per month, $20.00 per resident per month tracking fee; however, if MMS distributed the product, MediNet would charge $50.00 per resident per month for its billing services;

(3) NCS - $50.00 per resident per month; and (4) Pharmerica - $210.00 per resident per month.

As acknowledged by several McKesson-associated witnesses, prior to the CSMS contract, Medinet's contract billing services were almost always paired with McKesson subsidiary MMS supplying the product. Gail Beske, Vice President of Reimbursement Services of Extended Care and charged with authority over MediNet, testified that it was her mission to steer MediNet toward a contract billing-only structure, as opposed to contract billing plus supply based on the former's profitability. MediNet's two-tiered bid to CSMS was based on efficiencies realized by MediNet being able to use its own supplier. Such efficiencies include the ability to streamline patient information into the McKesson software system once, as opposed to inputting the patient information into the system separately for tracking, billing, and ordering; maintaining the proof of delivery within the McKesson structure; and managing product shipments and patient needs. Indeed, the record is replete with trial testimony regarding the problems inherent in dealing with outside suppliers, such as MediNet's inability to reconcile product ordered with product needed, and MediNet not receiving the information necessary to maintain the supplier standards, especially the paperwork necessary to maintain proof of delivery. Further, the MediNet representatives testified as to the lack of efficiency in another entity ordering product for which MediNet was held accountable to Medicare.

An incremental cost model prepared by Curt McLeod, of MediNet Oregon, and e-mailed out on October 4, 2002, introduced the $75.00 claim fee for contract billing, or $50.00 claim fee for contract billing coupled with DMEPOS supply. As the most knowledgeable about contract billing at MediNet, McLeod's evaluation of the service costs and projections was trusted completely in that organization. While McLeod's analysis did not include field service representative cost and failed

10

to analyze the full assignment business apart from the contract billing aspect, he projected that both endeavors - contract billing and the full assignment business - would be profitable in excess of $1.6 million over the three year term of the contract. Field service representatives (FSR) cost were not included in MediNet's costs to provide services to CSMS because the FSRs were not MediNet employees, but were paid by McKesson Medical-Surgical Minnesota.

MediNet submitted its bid on October 11, 2002, using the figures and numbers referenced in Curt McLeod's analysis. After the bid was submitted, Gail Beske and Carol Muratore, both of whom were in a position over MediNet, continued to work from McLeod's $75.00/$50.00 analysis to measure the incremental profitability of the contract after direct costs were deducted. MediNet resubmitted its initial bid to CSMS on December 5, 2002. Thus, MediNet rebid the $75.00 per patient per month for contract billing and $50.00 per patient per month if MMS supplied the products. However, on October 8, 2002, Ceres renewed Gulf South's general medical supply contract for Beverly's SNFs, which included the provision of enteral supplies for those SNFs. Upon resubmitting its bid for contract billing as well as the bid for contract billing plus product distribution, MediNet was told "not to expect the product side." At the latest, MediNet knew on January 14, 2003, that any agreement with CSMS would not include the distribution of enteral nutrition products. The factual development on the record established that CSMS could not have "dangled" the general medical supply contract in order to induce MediNet to lower its bid, as MediNet knew prior to its final bid that the general medical supply contract had already been awarded.

The Government introduced internal MediNet pricing projections in an effort to prove that MediNet's actual costs to provide services under the CSMS contract were above the price bid, or

11

that MediNet's bid was not fair market value or was discounted. If proven, those calculations could show that MediNet offered kickbacks to CSMS.

MediNet put together other profitability projections prior to entering into the 2003 Sales Agreement with CSMS. In particular, MediNet formulated a financial analysis based on three claims fees - $75.00, $70.00, and $65.00. The costs included on that analysis included operating expenses, sales coverage, pick, pack and ship of non-enterals, as well as start up costs. On that projection alone, MediNet believed claims fees of $65.00 per resident per month would be profitable. According to the testimony at trial, Beske and Muratore, two McKesson executives responsible for MediNet's bottom line, used this analysis to formulate MediNet's best and final offer to CSMS. Based on the chart and the handwritten notes accompanying it, MediNet believed ProClaim's bid to be at $65.00. They believed that maintaining their bid at $75.00 would "kill the deal" and acknowledged that MediNet should be able to do contract billing cheaper than any other company. Muratore and Beske both believed $70.00 per patient per month to be competitive in the contract billing market. Indeed, further financial projections of a $70.00 claim fee over a three year period showed a 10.3% return on sales. MediNet submitted its best and final offer for contract billing of enteral products for $70.00 per patient per month, $10.00 tracking fee, and full assignment of non-enteral products. ProClaim submitted a final bid for the same services for $69.00 per patient per month and $15.00 tracking fees per month.

Using a matrix of factors, CSMS determined that MediNet offered the best value for the price, even though it was not the lowest bid. Janet Houston, CSMS Director of Operations, testified that NCS and Pharmerica were eliminated from consideration in January of 2003, before CSMS requested best and final offers from MediNet and ProClaim. CSMS was worried that the

12

infrastructure of NCS would be too small to handle the volume of CSMS business, and CSMS lacked confidence in Pharmerica's abilities from its prior dealings with that entity. Janet Houston, Chris Roussos, and Eric Berlin, Beverly's in-house counsel, chose MediNet as their contract billing agent because of MediNet's experience as a contract biller, the number of patients serviced, the days sales outstanding, and low rejection rate of submitted claims to Medicare. Houston cited that MediNet was the contract billing agent chosen as MediNet had been in business since 1975, submitted 9000 claims per month, served 1500 facilities nationwide, and had a claim rejection rate of one percent. The 2003 Services Agreement between CSMS and MediNet was signed and became effective on March 1, 2003, for a three-year term in which CSMS agreed to pay $70.00 per enteral patient per month and a $10.00 per month tracking fee for all qualified residents. MediNet planned a nine-month rollout during 2003, with full capabilities in place in 2004.

During the terms of the Services Agreement, there was no indication from MediNet to CSMS that the contract was not profitable, and CSMS never reviewed or received any profitability analyses of the MediNet/CSMS contract.

*Interim Years*

In late November 2003, MediNet developed a new Billing Fee Schedule and disbursed it to all Regional Managers. This Billing Fee Schedule set prices for contract billing depending on the size of the customer and level of services provided. The new pricing scale was "very competitive" with the marketplace for comparable services. Under the new Billing Fee Service price list, a Large Chain Account (defined as "100+ facilities" on one fee schedule and "101-300" on another) for which MediNet was a "billing vendor only" would be charged $70.00 per patient per month for basic services, which included a customer service hotline, and $90.00 per patient per month for the

13

customer service hotline plus periodic field visits for document collection and inventory tracking. The Government alleged that CSMS received a discount on MediNet's contract billing services based on the figures outlined in the Billing Fee Schedule and the level of services MediNet promised in the Services Agreement. This, the Government contends, was a kickback to CSMS.

Les Henderson, Director of the procurement arm of Beverly Enterprises, identified the "Billing Plus" services anticipated to be performed by the contract billing agent for CSMS in 2003. CSMS expected its contract billing agent to perform a scope of services encompassing customer service, billing, document management and compliance, as well as field service support. In particular, CSMS wanted its contract biller to "[s]chedule routine facility visits by appropriately skilled field service reps, at minimum once per month." During those field visits, those representatives would procure documents to substantiate claims, verify and document proof of deliveries, and monitor product inventory. MediNet agreed to provide this level of services in the Services Agreement signed on March 1, 2003. The Billing Fee Schedule disbursed in November of 2003 indicated that a base level of service for contract billing included claims processing and customer service. The more substantial services, warranting the higher price, included claims processing, customer service, and "periodic field visits for document collection & inventory tracking." Thus, if the Billing Fee Schedule was applicable to CSMS, the services provided by MediNet would require CSMS to pay the higher $90.00 fee, as MediNet field service representatives were performing functions as listed on the higher purchase level of the schedule. MediNet contends that the Billing Fee Schedule did not apply to CSMS, as that account was a national account, and not subject to the regional pricing.

Evidence admitted at trial proved that MediNet continually put together projections,

14

substituting actual data when available throughout the duration of the 2003 Services Agreement. John Griffiths, Director of Planning and Analysis at Extended Care, compared the original financial projection with the February 2004 numbers generated under the 2003 Services Agreement. A summary of the differences in projected and actual costs produced in February of 2004 showed a decreased realization of profit. Griffiths acknowledged that the shortfalls resulted from a drop in the number of Beverly facilities, which decreased the number of patients serviced, leading to lower numbers. Griffiths later commented that the "[v]olume is below the planned level due to Beverly selling off a significant number of homes . . . ." He noted that the current operations were "only slightly below the planned profitability levels as a percent of sales." Griffiths numbers' showed, using ten months of actual data and two months of forecasted numbers, a healthy margin of profitability. Not only were profitability models run, but Beske received quarterly updates on the profitability of each of Extended Care's going concerns, of which the CSMS contract was one.

In late summer and early fall of 2005, Gary Keeler, another overseer of MediNet under the Medical-Surgical Minnesota umbrella, questioned the actual profits realized from the MediNet/CSMS agreement. Sandipan Panigrahi, a new financial analyst with McKesson Medical-Surgical Minnesota Extended Care, compiled profit and loss statements using CSMS-specific data. Panigrahi concluded that the contract was, at best, a breakeven proposition. Several executives questioned Panigrahi's extrapolation of the field service representative costs, but in the interest of analyzing the contract conservatively, continued to use those numbers throughout 2005. Beske, reviewing actual fiscal year data in March 2005, acknowledged that the "first year was a bust because of the rollout costs and delay in recognizing revenue from claim fees until the claims were billed." However, Beske noted that MediNet was "now making a good return and overall showed

an 8% [return on sales] over the 3 years of the contract."

In order to realize Beske's goal of a contract billing-only model for MediNet, Panigrahi analyzed contract billing by itself to determine profitability and costs per claim in June of 2005. The results were not specific to Beverly. According to Panigrahi's analysis, enteral contract billing cost MediNet $21.20 per patient. In a later analysis, Panigrahi seemed to indicate that the cost of CSMS enteral billing per patient was $51.64 without field service added into that equation. Panigrahi later analyzed the sales coverage expense to be between $7.80 and $5.15 per patient.

Panigrahi's final Beverly analysis was produced on August 4, 2005. Jeff Bowman, the Field Vice President of Reimbursement Services at Extended Care, answered Panigrahi's analysis with figures of his own and calculated the expense per patient to be $51.40. Based on Panigrahi's analysis, Beske considered the Beverly business "about break even, although the selling exp[ense] is subjective and overall profitability probably ranges from zero to $150K."

*2006 Transaction*

On September 13, 2005, Gulf South informed Beverly that it would no longer service the general medical supply contract signed in 2002. As a result, Ceres issued an RFP for the "$50 million contract." McKesson Medical-Surgical Minnesota, MedLine, and four other bidders responded. The contract was awarded to MedLine. MedLine was announced as the general medical supplier for Beverly Enterprises, Inc., on February 15, 2006.

Up until this point, enteral nutrition products were included in the Beverly SNFs general medical supply contract. It was decided that based on Gulf South's abrupt termination, enteral supply should be separated or "carved out" of the general medical supply contract. Because enteral products provided the nutrition and sustenance of an entire class of Beverly residents, and Gulf

16

South's unexpected determination to cease providing supplies as of a certain date, CSMS desired to remove that essential portion of product from the general medical supply contract. As a result, enteral supply distribution was added to the CSMS RFP issued February 27, 2006. All other particulars from the 2003 Services Agreement remained the same.

The 2006 bid process was initiated using Procuri software. Procuri allowed CSMS to distribute specifications and answer questions while providing the same information to all bidders. The software collected the bids from each supplier and helped create a level playing field for each company to competitively bid.

MediNet submitted the price it was charging from the 2003 agreement - $70.00 per resident per month, and $10.00 per resident per month tracking. MedLine, the only other bidder, submitted a price of $60.00 per resident per month for enteral contract billing, plus $15.00 per resident per month tracking. CSMS then changed its RFP and requested new submissions on the basis of three separate scenarios: Part B qualified contract billing and enteral supply plus (a) monthly visits to all facilities; (b) monthly visits to all facilities identified as high users; and (c) quarterly visits to all facilities. Janet Houston, CSMS Director of Operations, noted that because the Beverly nursing facilities had a good handle on the enteral nutrition program, it was not necessary to have representatives in the SNFs as frequently as before. CSMS eventually decided to go with the second option, defining "high users" as facilities with five or more enteral patients.

Based on the limitations of the scope of field services required, MediNet submitted a bid for $60.00 per resident per month, while MedLine submitted a $55.00 per resident per month bid. When asked for best and final offers, MediNet submitted a bid for $55.00 per patient per month with $10.00 per qualified patient per month tracking fee, which CSMS accepted. Beske noted that when

MediNet submitted the $55.00 final bid, it believed its closest competitor to have submitted a bid for $45.00.

Prior to bidding and entering into the 2006 Services Agreement with CSMS, MediNet had substantially more profit projections and actual data to consider. John Griffiths, Extended Care's Director of Planning and Analysis, testified that prior to the 2006 bid, the financial analysis showed that it would cost MediNet under $54.00 to bill and distribute enteral products according to the prior actual data analysis compiled in August of 2005. He indicated that MediNet would realize savings up to $165,000 per year by visiting only facilities with five or more enteral patients.

The contract was signed on June 1, 2006, and terminated by CSMS on January 15, 2008, for reasons unrelated to this lawsuit.

Between 2002 and 2008, forty-eight profitability analyses of the CSMS/MediNet contract were performed by MediNet or McKesson associates. No analysis presented to the Court outright evidenced MediNet lost money on those contracts. MediNet's use of an incremental cost model to project profitability was reasonable and was commonly used by MediNet in its dealings with other customers. MediNet projected that incremental revenues from contract billing fees at $70 in 2003, and $55 in 2006, would exceed the incremental expenses of providing such services once the agreements were fully implemented. No ledgers or actual accountings from MediNet were presented showing a loss. The actual data used in analyses and for forecasting showed MediNet was not losing money on the CSMS contracts. Further, the witnesses testifying on MediNet's behalf appeared credible when asserting that they believed the CSMS contract would be profitable. Moreover, these same witnesses were believable when they indicated that the prices submitted to CSMS were not below fair market value, below actual costs, or discounted. Carol Muratore, President of Extended

18

Care, averred that there was no secret as to where the pricing in the market was during the time

period at issue. The parties to this contract engaged in business negotiations that were fair,

reasonable, and warranted under the facts of this case.

*Conclusions of Law*

The False Claims Act imposes civil liability on any who "knowingly presents, or causes to

be presented, to an office or employee of the United States Government . . . a false or fraudulent

claim for payment or approval," 31 U.S.C. § 3729(a)(1) (2008), or "knowingly makes, uses, or

causes to be made or used, a false record or statement material to a false or fraudulent claim." 31

U.S.C. § 3729(a)(1)(B) (2009).[5]

---

[5]The Fraud Enforcement Recovery Act of 2009 (FERA), Pub. L. No. 111-21, § 386, 123 Stat. 1617 (2009), enacts several amendments to the False Claims Act, including changes to the language of subsections implicated in this action, namely 31 U.S.C. § 3729(a)(1), (2), and (3). Section 4(f) of FERA, the "retroactivity provision," states that the amendments shall take effect on the date of enactment of the Act (May 20, 2009), except that "subparagraph (B) of section 3729(a)(1) [formerly 3729(a)(2)] . . . , shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729, et seq.) that are pending on or after that date." During the pendency of this action, the Fifth Circuit in United States ex rel. Steury v. Cardinal Health, Inc. indicated that where a **complaint** was pending on June 7, 2008, the FERA amendment to (a)(2) would apply. 625 F.3d 262, 267 n.1 (5th Cir. 2010) ("Although the 2009 amendments to the FCA generally apply only to conduct on or after May 20, 2009, § 3729(a)(1)(B) applies retroactively to all claims pending on or after June 7, 2008 . . ."). The Fifth Circuit has recently affirmed a district court's determination that FERA's retroactivity provision did not apply, however, because "claim" was a term of art under the FCA, and the claims submitted to the Government were not pending on June 7, 2008, although the complaint was pending on that date. See Gonzalez v. Fresenius Med. Care N. Am., No. 10-50413 consol. with No. 10-51171, 2012 U.S. App. Lexis 15704, 2012 WL 3065314 (5th Cir. July 30, 2012) (citing United States ex rel. Gonzalez v. Fresenius Med. Care N. Am., 748 F. Supp. 2d 95, 106-08 (W.D. Tex. 2010)). Thus, under Steury, the Court should consider the amended FERA language, but pursuant to Gonzalez, the Court should not. Here, the Court cites the amended language of the (a)(2) claim because the parties cited the law as such. The Court has been unable to discern any difference in analysis for either language under the FCA or FERA. See Steury, 625 F.3d at 267 (stating elements for claim pursuant to FERA language as: (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that is presented to the Government); Gonzalez, 2012 U.S. App. Lexis

In order to establish a violation of the False Claims Act, a plaintiff must show that: (1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the Government to pay out money or to forfeit moneys due (i.e. that involved a claim). United States ex rel. Longhi v. Lithium Power Tech. Inc., 575 F.3d 458, 467 (5th Cir. 2009) (citing United States ex rel. Wilson v. Kellog Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008) (citations omitted)). Section 3731(c) of the False Claims Act provides that the United States must "prove all essential elements of the cause of action, including damages, by a preponderance of the evidence." 31 U.S.C. § 3731(c).

*False Certifications*

The Government claims that because the Defendants violated the Anti-Kickback Statute, all claims submitted by those entities for payment through Medicare are "false claims" under the False Claims Act. Thus, those claims are alleged to be legally false, as opposed to factually false. To be "legally false," the Government must prove that the claimant knowingly falsely certified that it complied with a statute or regulation of which compliance is a condition for Government payment. United States v. Southland Mgmt. Corp., 288 F.3d 665, 678 (5th Cir. 2002); cf. United States ex rel. Mikes v. Straus, 274 F.3d 687, 697 (2d Cir. 2001) (proof of falsehood under a "factually false" theory of liability involves showing that the government payee has submitted "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided"). Courts have further delineated legally false claims into two separate categories: expressly false and impliedly false claims. Under the "express false certification" theory, an entity

---

15704, *9 (listing elements of FCA action as same). Regardless of whether the Court considers the Government's claims under the FCA or FERA, those claims still fail.

is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds. Rodriguez v. Our Lady of Lourdes Med. Ctr., 552 F.3d 297, 303 (3d Cir. 2008). Thus, "where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997) (false certification on annual cost reports that entity is compliant with anti-kickback statute can establish FCA liability).

The implied certification theory of liability under the FCA is "based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." Steury, 625 F.3d at 268 (citations omitted). The Fifth Circuit has not recognized this theory,[6] and this Court has on at least two occasions refused to acknowledge this as a viable cause of action in this Circuit as well. Defendants assert that the Government's contentions - that the claims submitted were false because the DME supplier enrollment application required compliance with the Anti-Kickback Statute, but CSMS and MediNet violated that statute by offering or causing to be offered remuneration for referrals - fit squarely within the implied false certification theory. The Court disagrees and clarifies its reasons for believing so here.

In order to directly bill Medicare as a DME supplier, Kevin Roberts, on behalf of CSMS,

---

[6]Indeed, the Fifth Circuit has avoided recognizing the implied certification theory of liability on several occasions. See Gonzalez, 2012 U.S. App. Lexis 15704, *12 n.6, 2012 WL 3065314; United States ex rel. Marcy v. Rowan Co., Inc., 520 F.3d 384, 389 (5th Cir. 2008); United States ex rel. Willard v. Humana Health Plan of Tex., 336 F.3d 375, 381-82 (5th Cir. 2003); United States ex rel. Stebner v. Stewart & Stephenson Servs., Inc., 144 F. App'x 389, 394 (5th Cir. 2005).

signed a statement acknowledging that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law) . . . ." CSMS applied for re-enrollment in June of 2006 and again signed the same declaration that payment was conditioned on compliance with the Anti-Kickback Statute. Barry Bromberg, project officer for National Supplier Clearinghouse, a contractor for Medicare, testified that an entity must be enrolled to get a DME supplier billing number, enabling that entity to bill Medicare for products and services.

Without a signed certification statement, no DME supplier number will be issued. Therefore, to enroll as a DME supplier, CSMS had to sign the certification assuring compliance with the AKS. This completed enrollment application is the first step in securing a DME supplier number. Without a DME supplier number, Medicare would not reimburse a supplier for those products and services. Thus, an entity could not bill and receive payment from Medicare without a DME supplier billing number. See Gonzalez, 2012 U.S. App. Lexis 15704, *12 n.6, 2012 WL 3065314 (the question of whether or not certifications are a condition of payment is a question of fact). This certification on the enrollment application is a condition of payment under Medicare. Accordingly, Roberts' signature on the enrollment certification assuring that CSMS would comply with the AKS was a condition of payment under Medicare.

The allegations in the Government's complaint sufficiently fit under the express certification theory of recovery. In particular, CSMS executed a statement that all claims and the transactions underlying CSMS's claim for payment complied with the AKS. Without that signed certification, a DME billing number would not have been issued. Without a DME billing number, claims

22

submitted to Medicare would not be paid, and no reimbursements from Medicare would issue. Thus, CSMS's allegedly false certification of compliance with the AKS may render the claim submitted under that number false. However, because there was no violation of the Anti-Kickback Statute, regardless of whether the Government's claims are classified under the express certification theory or implied certification theory, the Government's contentions fail.

### *Anti-Kickback Statute*

The Government claims Defendants' violations of the AKS satisfies the first prong of an FCA claim, i.e., that CSMS and the MediNet Defendants engaged in a false or fraudulent course of conduct. The Anti-Kickback Statute imposes criminal penalties on anyone who

> knowingly and willfully offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b) (2008). When analyzing alleged violations of the AKS, a key distinction is that the law "does not criminalize referrals for services paid for by Medicare or Medicaid — it criminalizes knowing and willful acceptance of remuneration in return for such referrals." United States v. Ctr. for Diagnostic Imaging, Inc., 787 F. Supp. 2d 1213, 1218 (W.D. Wash. 2011) (quoting Klaczak v. Consol. Med. Transp., 458 F. Supp. 2d 622, 678 (N.D. Ill. 2006)).

At trial, the Government did not put on sufficient proof of an AKS violation, specifically that there was any remuneration either offered or paid. Indeed, the Government failed to prove MediNet offered its contract billing services below fair market value, below actual costs, or at a discount, or that the CSMS Defendants intended to induce MediNet to offer a lower price by dangling the general medical supply contract or carving out enteral supply from the general medical supply

23

contract.    Further, the Government failed to prove that the Defendants had knowledge of any alleged kickback offered or paid.

*(a) Inducement and Remuneration*

Inducement serves a central role in assessing claims of Medicare fraud. See Polk County, Tex. v. Peters, 800 F. Supp. 1451, 1455 (E.D. Tex. 1992) ("The gravamen of Medicare fraud is inducement."). The Government failed to prove by a preponderance of the evidence that Defendants induced referrals by offering or paying remuneration.[7]   Indeed, the evidence showed that the Government's allegations that CSMS "dangled" the general medical supply contract or "carved out" enteral supply for MediNet or McKesson to be without merit, and failed to prove that MediNet offered its services below fair market value, below actual costs, or at a discount.   Therefore, there was no inducement or remuneration necessary for an AKS violation.

*(i) CSMS Defendants*

The Government asserts that the CSMS Defendants dangled the prospect of the general medical supply contract in order to induce MediNet to lower its billing fee.   Evidence revealed at the trial showed that Gulf South renewed its general medical supply contract with the Beverly conglomerate prior to the bids on the 2003 CSMS contract being received.   Indeed, the renewal contract for the general medical supply was signed on October 8, 2002.   Bids for the contract billing

---

[7]The Court analyzed the Government's AKS claims under the "preponderance of the evidence" standard common in civil actions as opposed to the criminal "beyond a reasonable doubt" standard.   Because the Government has failed to meet the lower civil standard, it is inconsequential which is the proper standard to consider for civil liability to attach under the AKS.   However, the Court acknowledges that if this case were a closer call, the proper course would likely be to use criminal intent to prove a civil AKS violations.   See Gonzalez, 2012 U.S. App. Lexis 15704, 2012 WL 3065314 (affirming district court's grant of judgment as a matter of law on the AKS violation for failure to show "criminal intent to induce referrals").

vendors were due on Ocotber 11, 2002. At the latest, MediNet had documented knowledge that the supply side was "off the table" in January of 2003, prior to the final bid for the 2003 Services Agreement in February. Therefore, the Beverly general medical supply contract could not be an inducement for any alleged kickback. Likewise, in 2006, the general medical supply contract was signed with MedLine prior to the RFP for the enteral supply and billing contract being disbursed to potential bidders. Not only was the general medical supply contract already signed with another medical supplier prior to the bids on both transactions, proof at trial showed that MediNet and McKesson were aware that the contracts had been awarded before bidding on the DME contracts with CSMS. Indeed, McKesson had bid on the general medical supply contract and been found not to be the lowest bidder or most competitive for that business. If CSMS and Beverly were intending to induce MediNet to lower its billing fees by dangling the opportunity to receive the general medical supply contract, it seems illogical that Beverly would award the $50 million contract prior to the bids on contract billing. Thus, the general medical supply contracts could not have been an incentive or an inducement for referrals under the AKS.

The Government alluded to the possibility of working with Beverly as the overarching goal of McKesson, but presented no proof that either party did anything illegal or in bad faith. Indeed, in order to violate the AKS, it is not enough to covet the business of another, there must actually be some bad intent to violate the law. United States v. Davis, 132 F.3d 1092, 1094 (5th Cir. 1998).

The Government contends that CSMS "carved out" the enteral supply distribution from the general medical supply contract on a promise by MediNet to lower prices on its enteral billing services in exchange for the enteral product distribution. The credible proof at trial showed that Gulf South's abrupt exit from the general medical supply contract made Beverly's SNFs nervous

about such an important piece of product being subject to the whims of one company. Indeed, the Court understands why enteral products, as nutrition for eligible patients, would be deemed critical by those charged with patient care.

Moreover, MediNet's initial bid for the 2006 transaction including enteral supply was the same bid as the 2003 transaction without enteral supply. Accordingly, the "carving out" of enteral supply from the general medical contract did not result in lower contract billing prices. It was only after negotiations and a winnowing of services that MediNet lowered its bid. The Government does not meet its burden with conjecture regarding ultimatums issued by MediNet to CSMS to carve out the enteral distribution. Again, the Court finds it illogical that MediNet could force CSMS to alter its national contracts to secure a lower price when others were bidding similarly, or sometimes lower, to perform the same services for CSMS.

Thus, as the Defendants contended at trial, the Government has failed to show any *quid pro quo* in the dealings between the MediNet and CSMS Defendants. See <u>Gonzalez</u>, 2012 U.S. App. Lexis 15704, 2012 WL 3065314 (no "quid pro quo" or AKS violation where volume of referrals remained constant regardless of alleged wrongdoing).

*(ii) MediNet Defendants*

The Government asserted that the MediNet Defendants violated the AKS by offering as remuneration contract billing services priced below fair market value, below the actual cost to provide those services, or at a discount. Because the Government did not define fair market value or show that MediNet's bid was below fair market value, prove the actual costs were above MediNet's bid, or establish that the bids were discounted, the Government has "failed to identify a reliable benchmark against which the Court [can] determine whether the contracts satisfy the

statutory definition of remuneration." <u>See</u> <u>Klaczak</u>, 458 F. Supp. 2d at 626.

In the context of the AKS, courts use "fair market value" as the gauge of value when assessing the remuneration element of the offense. <u>See</u> <u>Klaczak,</u> 458 F. Supp. 2d at 679; <u>United States ex rel. Obert-Hong v. Advocate Health Care</u>, 211 F. Supp. 2d 1045, 1049 & n.2 (N.D. Ill. 2002). Fair market value as a concept was never defined by the parties at trial or in earlier pleadings or motions. Black's Law Dictionary defines "fair market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arms'-length transaction." BLACK'S LAW DICT. 1691 (9th ed. 2009). A similar definition has been used under the AKS. <u>See</u> <u>Klaczak</u>, 458. F. Supp. 2d at 678 (defining fair market value under the AKS as "the price a willing buyer would pay a willing seller . . . when neither is under compulsion to buy or sell") (citing <u>United States v. Draves</u>, 103 F.3d 1328, 1332 (7th Cir. 1997). Barry Bromberg, a project officer for the National Supplier Clearinghouse, testified that in his opinion, a fair market value could be determined through competitive bidding.

As evidenced by the prices listed above, MediNet's bid was not the lowest and not unreasonable when viewed alongside the other bids. Further, as the Government failed to prove that the general medical supply contract was improperly "dangled" over MediNet in order to receive a lower contract billing fee, the 2003 negotiations were not tainted. Likewise, because the enteral supply was not "carved out" as an inducement for a lower price in 2006, those negotiations were arms-length transactions as well. The Government's allegations of wrongdoing by CSMS and MediNet were not proved convincingly enough to warrant a finding that the two bidding transactions were tainted by collusive bad acts.

MediNet's initial and final bids were not the lowest received by CSMS. In fact, CSMS chose

MediNet as a contract biller despite MediNet's offer being higher than other competitors. The Government attempts to infer that because Pharmerica's 2003 bid of $210.00 was three times MediNet's final offer, that MediNet's bid was not fair market value. Based on the definition of fair market value identified above, the Government's contention fails The Government has failed to prove that the bidding process for the 2003 transaction was not competitive or was tainted in any way, such that it would not be an arms-length transaction which would reveal the fair market value of the services at issue here.

The Government failed to prove that MediNet offered remuneration by pricing its services below the actual costs to provide them. MediNet constructed over forty analyses related to the CSMS business, including proposed pricing reviews, anticipated profitability constructions, and calculations using actual data. None of the analysis reviewed by the Court showed MediNet to be unprofitable over the term of the agreements. The numbers and reviews by MediNet introduced at trial employed an incremental cost analysis to calculate anticipated profits. Using this method of accounting, the MediNet Defendants projected the amount of costs associated with the CSMS contracts by analyzing costs expected to increase solely because of that business. According to the incremental cost model, fixed costs and overhead, including executive salaries and property costs, were not associated or accounted as a cost inherent in the CSMS business because such expenses would be incurred regardless of whether MediNet won the contract or not. The Government sought to highlight the fact that an incremental cost analysis was not the proper way to analyze profitability of a contract; however, Plaintiff failed to present evidence that such analysis was either illegal under the AKS or improper under standard accounting principles. John Griffiths, a financial analyst and analyst supervisor for MediNet, noted that the incremental cost analysis is a well-accepted method

of analyzing opportunities and profitability.

The Government highlighted as evidence of MediNet's deliberate indifference or knowledge that the price submitted was below actual costs the fact that in some analyses field service costs were not included. Field service representatives were employees of McKesson Medical-Surgical, not MediNet, therefore, it was reasonable in determining the incremental profit projections for MediNet, that FSR costs would not be included in the analysis. At trial, the parties spent a good deal of time cobbling together calculations using numbers garnered from different documents and analyses in order to show either that MediNet priced its bids below the actual costs to provide the services or that its actual costs were lower than the number originally projected. Indeed, where the Government manipulated the numbers to show a definitive loss, the MediNet Defendants could calculate other numbers to show a profit. Overall, the Court was left with the impression that the Government failed to prove that the MediNet bids were priced below actual costs by a preponderance of the evidence. The Government's arguments of remuneration offered based on the actual costs to provide those services is unfounded in the record.

The Court further finds that any negotiations to get a final bid for services was not a "discount" as alleged by the Government for two distinct reasons: first, the bids in 2003 and 2006 were fair market value; and second, prior to the 2003 bid, MediNet had no set pricing list from which to discount, and the 2006 bid complied with the Billing Fee Schedule developed by MediNet.

As noted above, the final bids submitted by MediNet in both 2003 and 2006 were fair market value to the extent that the bidding process was an arms-length transaction and other bidders were willing to provide the services for similar, if not lower, prices. Indeed, most other bidders submitted prices that were, if not lower, within a few dollars of MediNet's opening bid. Because such price

29

reflects fair market value, even if MediNet could have charged a higher price, CSMS did not get the benefit of a discount as there were other bidders willing to sell the services at MediNet's final bid price.

MediNet's Billing Fee Schedule was not formulated or implemented prior to the commencement of the 2003 Services Agreement, or even bid negotiations. According to the testimony at trial, the Billing Fee Schedule, emailed and promoted to Regional Account Managers, was intended to govern regional accounts only. As CSMS was a national account, not a regional account, and at all times had over three hundred facilities, the Billing Fee Schedule did not apply to that entity. Even if the fee schedule applied, however, because the schedule was developed and implemented after commencement of the 2003 Services Agreement, it is not indicative of any malfeasance on the part of MediNet as to the earlier contract between CSMS and MediNet. If the Billing Fee Schedule covered the CSMS business, by 2006, CSMS would qualify as a "prime vendor," placing its fee range at either $45.00 for customer service and billing only, or $65.00 for customer service, billing, and field service once a month. Since the 2006 RFP indicated a reduced scope of services from full service, the Court finds MediNet's $55.00 fee to be reasonable.

The Government failed to prove that Defendants violated the AKS by offering or paying any remuneration to induce referrals. CSMS did not dangle its general medical supply contract over MediNet, or carve out enteral distribution in the 2006 contract billing agreement in order to induce MediNet to offer its services for below fair market value, actual costs, or at a discount. Likewise, MediNet did not offer its services for below fair market value, actual costs, or at a discount in order to induce CSMS to carve out the enteral distribution in 2006 or as an inducement for the general medical supply contract. The Court finds this failure of proof enough to find in favor of Defendants.

However, because Plaintiff further failed to prove knowledge or intent under either the AKS or FCA, the Court analyzes the proof under that element as well.

*(b) Knowledge*

"Knowledge" has been proven in AKS criminal cases where proof that "the act was done voluntarily and intentionally, not because of mistake or accident." <u>Davis</u>, 132 F.3d at 1094 (citing <u>United States v. Garcia</u>, 762 F.2d 1222, 1224 (5th Cir. 1985) (knowledge of the particular law allegedly violated not required)). The Government asserts that the Defendants had knowledge of or were deliberately indifferent as to whether an AKS violation occurred. The Fifth Circuit has affirmed the giving of a deliberate indifference jury instruction in criminal AKS cases. <u>United States v. Ogba</u>, 526 F.3d 214, 230 (5th Cir. 2008); <u>United States v. Brown</u>, 354 F. App'x 216, 223 (5th Cir. 2009). A deliberate indifference instruction is warranted if the evidence at trial raises two inferences: "(1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposefully contrived to avoid learning of the illegal conduct." <u>Brown</u>, 354 F. App'x at 223 (citing <u>United States v. Lara-Velasquez</u>, 919 F.2d 946, 951 (5th Cir. 1990)).

The AKS also requires that Defendants act "willfully." Under the AKS, "willfully" is defined as any act "committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." <u>Davis</u>, 132 F.3d at 1094. Because the Government failed to prove that the Defendants acted "knowingly and willfully" in either of the transactions, no AKS violation has been proven.

The evidence presented at trial shows that Defendants lacked the intent to commit an AKS violation. On several occasions, MediNet employees admitted to substituting arbitrary figures into

31

analyses where numbers or costs were unknown. They assumed those figures were conservative estimates, even though oftentimes, they were not. On some analyses, the cost per patient was generated on the basis of all patients, not solely enteral patients. Beske admitted to "misplacing" numbers used from one analysis to another; in particular, the cost difference calculated between MediNet or McKesson supplying enteral products with contract billing versus another company supplying those products. Further, the number of facilities used to approximate the cost per patient was never concrete or based on the actual number of SNFs. Because of the number and differing backgrounds of persons at MediNet putting together cost projections, it is understandable why those figures and analyses are not consistent. The Government did not prove that Defendants were intentionally or deliberately mishandling the numbers, but were more likely negligent or careless. Such carelessness does not evidence a willful wrong intentionally committed against the Government.

The 2006 transaction is substantively different from the 2003 transaction because of the variance in the scope of services provided to CSMS. Testimony at trial indicated that the number of Beverly SNFs with five or more enteral patients would be roughly one third of the facilities previously required to be visited monthly under the 2003 Services Agreement. Griffiths testified that such a limit on the scope of services would reduce the cost of field services by $165,000.

Like the 2003 transaction, MediNet engaged in a significant number of financial projections using actual and forecasted data. MediNet believed that with the reduction in the scope of services, it would be profitable charging $55.00 per patient per month for its contract billing services. MediNet's $55.00 bid was not the lowest received by CSMS in the arms-length negotiations. Further, the Government failed to prove $55.00 was below its actual costs to provide these services.

32

MediNet's price charged under the 2006 Agreement was consistent with the Billing Fee Schedule for largest nursing facility chain with reduced field service. In 2006, CSMS qualified as a "prime vendor" which made CSMS eligible for pricing of $45.00 per patient per month for basic services, and $65.00 per patient per month for enhanced services, including monthly visits to all facilities. MediNet's final bid of $55.00 for reduced scope of services splits the Billing Fee Schedule between those two outlier figures. Accordingly, MediNet Defendants did not knowingly or willfully violate the AKS because MediNet thought the prices quoted in negotiations for the 2006 contract were reasonable, fair, and profitable for MediNet.

The CSMS Defendants, likewise, did not knowingly or willfully solicit bids below fair market value, actual costs, or at a discount in either the 2003 or 2006 transactions. As proved at trial, the CSMS Defendants were not apprised of any profitability projections as to the CSMS contract, nor did they know the actual cost of contract billing per patient per month. Therefore, the Government has not proved the liability of the CSMS Defendants, as they had no knowledge of any alleged kickback. Also, there was no proof presented that the CSMS Defendants were deliberately indifferent to any alleged kickback, as the bid process showed others bidding the similar, sometimes lower, amounts.

Accordingly, the Government has failed to show Defendants had knowledge or acted willfully such that liability under the AKS would attach. Likewise, because the burden of proof as to the scienter element under the AKS was not carried, the Government has also failed to carry that burden as to the False Claims Act. Accordingly, no false claims exist under the facts alleged to support FCA violations.

*Unjust Enrichment*

The Government likewise failed to prove that Defendants were unjustly enriched by a preponderance of the evidence for the foregoing reasons.

*Conclusion*

The Government failed to carry its burden that Defendants violated the AKS by offering or paying remuneration to induce referrals or having knowledge of such violation. For the reasons previously stated, the Court finds for the Defendants. Judgment is hereby ordered in favor of the Defendants.

SO ORDERED, this the 28th day of September, 2012.

　/s/ **Sharion Aycock**　　　　　　　
**U.S. DISTRICT JUDGE**

34